## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DOMONIQUE MOORE,          )
                                  )
          Plaintiff,        )
                                  )
vs.                           )
                                  )   Case No. 2:25-cv-02626
UNIFIED GOVERNMENT OF     )
WYANDOTTE COUNTY AND     )
KANSAS CITY, KANSAS; MATTHEW  )
GOLUBSKI, AS PERSONAL      )
REPRESENTATIVE OF THE ESTATE OF )
CAPTAIN ROGER GOLUBSKI; DETECTIVE )
BRYAN BLOCK; DETECTIVE DARREN  )
KOBERLEIN; DETECTIVE RANDY SLATER; )
DETECTIVE DION DUNDOVICH; CAPTAIN )
BILL HOWARD, JR., all in their individual
capacities,

          Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Domonique Moore, by and through his attorneys, hereby alleges as follows:

## INTRODUCTION

1.      Cedric Warren and Domonique Moore[1] spent more than 15 years wrongfully

imprisoned for crimes they did not commit: the February 13, 2009, murders of Charles Ford and

Larry LeDoux and the attempted murder of Brandon Ford.[2]

---

[1] Domonique Moore's name is spelled various ways in police reports, court documents, and legal filings in this case, including but not limited to Domonic Moore, Dominic Moore, Dominique Moore, and DJ Moore. His real name is Domonique Moore, which is how he will be referred to throughout this Complaint.

[2] Brandon Ford will be referred to as Brandon, and Charles Ford will be referred to by his first name, Charles.

1

2.      Mr. Warren and Mr. Moore are completely innocent of and had nothing to do with these crimes.

3.      Mr. Warren and Mr. Moore's wrongful convictions were not an accident but rather the result of misconduct by Kansas City, Kansas Police Department (KCKPD) detectives.

4.      The case against Mr. Warren and Mr. Moore was incredibly weak. Their convictions rested entirely on coerced and fabricated identifications from the surviving victim Brandon Ford, who from the start of the investigation gave inconsistent and unreliable information and who suffered from severe mental illness, including paranoid schizophrenia and delusions. Brandon's mental health deficiencies and impairments were so serious that at least two courts had raised questions about whether he was competent to proceed in his own criminal cases, and he was found incompetent to be tried by a Wyandotte County judge. Several civil proceedings directly addressed his competency and found that he was in need of emergency psychiatric care.

5.      Within hours of the homicide of Charles and Mr. LeDoux, and without any evidentiary basis, Defendants targeted and surveilled Mr. Warren and Mr. Moore at the direction of KCKPD Captain Roger Golubski, who supervised the investigation and was widely known within the community and the KCKPD for using the power of his badge to sexually exploit poor Black women, protect drug dealers who he was in business with, and manufacture cases against innocent individuals.

6.      To connect the case to the innocent Mr. Warren and Mr. Moore, Defendants exploited Brandon's significant mental health problems by coercing and pressuring Brandon into making false eyewitness identifications of Mr. Warren and Mr. Moore.

7.      Under Golubski's supervision, Defendants kept Brandon in their custody for almost 20 hours and used suggestion, pressure, and coercion to get him to falsely identify Mr. Warren and Mr. Moore as the gunmen.

8.      Defendants knew that Brandon's vulnerable state and mental health problems made him particularly susceptible to this police pressure.

9.      Immediately after Defendants secured the false identifications from Brandon, they took Brandon directly from the police station to an in-patient psychiatric mental health facility, where he was admitted as a patient for the next several days.

10.     Over the next few days, Defendants and the KCKPD visited Brandon at the facility multiple times to ensure that Brandon wouldn't deviate from the false story that they fed to him: that he saw Mr. Warren and Mr. Moore commit the shooting.

11.     Defendants knew that the entire case against Mr. Warren and Mr. Moore hinged on Brandon appearing credible.

12.     Defendants never reported or documented that Brandon only identified Mr. Warren or Mr. Moore due to police pressure and suggestion.

13.     Nor did Defendants report or document Brandon's serious mental health problems. Defendants failed to disclose any evidence of Brandon's long-standing and severe psychiatric illnesses. And they didn't document that they took Brandon directly to a mental health facility after their interrogation of him, or that they had visited him at the facility to discuss the case. Defendants also did not document Brandon's repeated psychotic episodes and psychiatric hospitalizations, or his delusional and disorganized thinking, memory impairment, or detachment from reality.

14.     Mr. Warren and Mr. Moore were tried together in October 2010 and were convicted of two counts of murder and one count of attempted murder.

15.     The focus of the trial was Brandon's identifications of Mr. Warren and Mr. Moore. As the prosecutor put it to the jury at the trial, to convict Mr. Warren and Mr. Moore, "you have to believe" Brandon. Yet even the prosecutor admitted Brandon's story was "inconsistent."

16.     But the prosecutor didn't know that worse than wildly inconsistent, Brandon's identifications were entirely false and only came as a result of police pressure and suggestion. The prosecutor also didn't know that before and at the time of trial, Brandon had a severe mental health history riddled with delusions and paranoia.

17.     In other words, the prosecutor and the jury never learned that there was no reason whatsoever for any juror to believe Brandon.

18.     But for Defendants' misconduct, Mr. Warren and Mr. Moore would never have been prosecuted or wrongly convicted.

19.     For years, Mr. Warren and Mr. Moore steadfastly maintained their innocence and fought for their freedom.

20.     Finally, in December 2024, a Wyandotte County Judge dismissed all charges against Mr. Warren and Mr. Moore and vacated their convictions. The court ruled that their constitutional rights had been violated because the State had suppressed critical evidence that undermined Brandon's credibility.

21.     In all, Mr. Warren and Mr. Moore each spent 15 years, 9 months, and 25 days incarcerated for crimes they did not commit.

22.     Through this civil rights action, Mr. Moore seeks to bring the Defendants'
misconduct to light and to ensure they are held accountable for their actions. Mr. Moore also
seeks justice for the more than 15 years that he lost as a result of his unjust conviction.

## JURISDICTION AND VENUE

23.     This action is brought under 42 U.S.C. § 1983 to redress the deprivation under
color of law of Mr. Moore's rights as secured by the U.S. Constitution.

24.     This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1367.

25.     Venue is proper under 28 U.S.C. § 1391 (b) and (c). On information and belief,
the events giving rise to the claims asserted herein all occurred within this district.

26.     Plaintiff gave notice to the Unified Government of Wyandotte County and Kansas
City, Kansas by timely filing a notice of claim under KSA § 12-105b with the Unified Government
clerk, and more than 120 days have elapsed without a response.

## JURY DEMAND

27.     Plaintiff demands a trial by jury on all issues and claims set forth in this
Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of
Civil Procedure 38(b).

## PARTIES

28.     Plaintiff **Domonique Moore** is currently a 41-year-old resident of Kansas City,
Missouri. At all times relevant to this Complaint, Plaintiff was a resident of Wyandotte County
and the State of Kansas.

29.     Defendant **Unified Government of Wyandotte County and Kansas City,
Kansas,** is the successor of the municipality, the City of Kansas City, Kansas. The Unified
Government was created by and established under the law of the State of Kansas in 1997. It is

authorized to sue or be sued in its own name. Its headquarters is located at 701 N. 7th Street, Kansas City, Kansas. The City of Kansas City, Kansas, is a subdivision of the Unified Government and is located within Wyandotte County.

30.    Defendant **Bryan Block** was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

31.    Defendant **Darren Koberlein** was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

32.    Defendant **Randy Slater** was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

33.    Defendant **Dion Dundovich** was, at all times relevant to this complaint, a duly appointed and active detective of the KCKPD acting within the scope of his employment and

under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

34.     Defendant **Bill Howard, Jr.** was, at all times relevant to this complaint, a duly appointed and active captain of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

35.     **Defendant Matthew Golubski, the personal representative of the Estate of Roger Golubski**, administers the estate of Roger Golubski, who is deceased. At all times relevant to this complaint, Roger Golubski was a duly appointed and active captain of the KCKPD acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.[3]

---

[3] All allegations and references to Defendant Roger Golubski throughout this Complaint form the basis for the claims against the Personal Representative of his Estate.

## FACTS

**Charles Ford and Larry LeDoux were shot and killed.**

36.     On February 13, 2009, Charles Ford, Larry LeDoux, and Brandon Ford were staying at 3719 Webster Street, a known drug-house in Kansas City, Kansas, that was owned by their cousin, Deshawn Bryant. Mr. Bryant was out of town at the time.

37.     That evening, Charles was reportedly armed with a loaded 9mm Glock, and Mr. LeDoux was reportedly armed with a loaded AK-57. Additionally, a kilo of cocaine and $20,000 were reportedly being stored in the house.

38.     Shortly before midnight, gunmen entered 3719 Webster. After an exchange of gunfire, Charles and Mr. LeDoux were shot and killed. They died at the scene from gunshot wounds.

39.     After the gunfire ended, Brandon observed gunmen running from the house to a black SUV.

40.     Brandon then fled from the house with a gun in hand and sought help from neighbors. Two separate neighbors called 9-1-1. One neighbor reported hearing gunshots and said that a Black man carrying a gun had arrived at the door saying someone was shooting at him. Another neighbor reported that someone was at his house asking for help because he had been shot at. No one reported seeing any other people with guns or a black SUV.

**Mr. Warren and Mr. Moore are innocent.**

41.     Mr. Warren and Mr. Moore are completely innocent. They were not present for and had no involvement whatsoever in the homicides of Mr. LeDoux and Charles, and the attempted homicide of Brandon.

42.    Mr. Warren and Mr. Moore are six years apart in age and were not friends. They rarely spent time together, and in February 2009, they had never socialized together one on one. In February 2009, Mr. Warren was 18 years old, and Mr. Moore was 24 years old.

43.    Mr. Warren had only been to 3719 Webster a few times and likewise had only interacted with Charles, Mr. LeDoux, and Brandon a few times.

44.    Mr. Moore had never been to 3719 Webster and had never met or heard of Charles, Mr. LeDoux, or Brandon.

45.    No fingerprints of Mr. Warren or Mr. Moore were found at the crime scene.

46.    There was no biological, physical, or forensic evidence found at the crime scene that connected to Mr. Warren or Mr. Moore.

47.    Forensic testing conducted by the Kansas Bureau of Investigation excluded Mr. Warren and Mr. Moore as the source of shoeprint impressions found at the scene. Additionally, neither Mr. Warren's nor Mr. Moore's shoes—the only clothing items that the KCKPD tested—contained any traces of blood.

48.    The KCKPD failed to conduct or did not document basic forensic testing on multiple other pieces of evidence. Had the KCKPD conducted additional forensic testing, the results would have been exculpatory to Mr. Warren and Mr. Moore.

49.    Mr. Warren and Mr. Moore had no motive to commit the crime.

50.    Mr. Warren and Mr. Moore had corroborated alibis. On the night of the homicides, Mr. Warren and Mr. Moore were nowhere near the homicides. Mr. Warren was with his father and stepmother, and Mr. Moore was with his girlfriend.

51.    At the time of the homicides, Mr. Moore was recovering from surgery and was unable to run. His gait was severely impaired and he was using a cane to walk. He would have been physically unable to run from 3719 Webster to the car.

**Brandon Ford suffered from severe longstanding mental health problems.**

52.    In February 2009, Brandon suffered from a long and serious history of significant medical issues and mental health problems. His mental health history included severe psychosis and impairment, hallucinations, delusions, psychotic and disorganized thinking, detachment from reality, marked cognitive impairment, and a serious history of substance abuse.

53.    In the years before the shooting, Brandon had been involuntarily hospitalized numerous times for paranoid schizophrenia. Though he had been diagnosed with paranoid schizophrenia, he had been consistently unmedicated.

54.    Just a couple years before the February 2009 shooting, the Wyandotte County District Court had ordered a competency evaluation on Brandon, and he was found incompetent to stand trial.

55.    Brandon's mental health impairments were well known and obvious to people who knew and interacted with him. He was known around the neighborhood by the nickname, "Loco." Brandon's family didn't let Brandon use or carry firearms because of his mental illness.

**Brandon told the KCKPD wildly inconsistent accounts of what happened.**

56.    Four minutes after the first 9-1-1 call, responding KCKPD officers encountered Brandon a few blocks from the scene.

57.    ***Brandon's first documented statement (reportedly taken around 11:57 p.m.).*** Brandon told the responding officers his name was Joseph Ford, and he was scared because "guns had gone off." Brandon reported that a friend had taken him to McDonald's and was

dropping him back off at 3719 Webster. He said that when he approached the house, people started shooting at him.

58.    ***Brandon's second documented statement (reportedly taken around or a bit after midnight).*** The initial responding officers brought Brandon to their squad car where another officer interviewed him. At that point, Brandon admitted he was Brandon Ford and that he had been inside the house during the shooting. **But Brandon said he wasn't able to give any description of the shooters because he was in the bathroom and had not seen the shooters.**

59.    The officers instructed Brandon to remain waiting in the KCKPD squad car until homicide detectives were able to take custody of him.

60.    Defendants Darren Koberlein and Bryan Block were assigned as the detectives in charge of the investigation. They both arrived at the scene before 1:00 a.m. on February 14, 2009.

61.    ***Brandon's third documented statement (reportedly taken between midnight and 2:17 a.m.).*** Defendant Koberlein interviewed Brandon at the scene in the early hours of the morning. According to a police report authored by Defendant Block, Brandon told Koberlein that he was inside the house with Charles and Mr. LeDoux when a black SUV pulled up and two people exited the car. Brandon went to the bathroom when Charles answered the front door. Brandon heard someone say, "where is the shit!," followed by the sound of shots being fired. Brandon ran to a bedroom, found a gun that was hiding in the room, and exchanged fire with the assailants through the closed bedroom door.

62.    According to Block's report, Brandon provided to Koberlein very vague descriptions of the assailants: **(1) a guy with short hair and dark complexion, and (2) a guy**

**with brownish complexion wearing braids. Neither Block nor Koberlein reported that**

**Brandon gave any further description of the assailants.**

63.    Even though Brandon made clear that he didn't know who the shooters were and couldn't give any further descriptions of them, Defendants Koberlein and Block took Brandon to the police station and continued to interrogate him all morning and afternoon. Brandon didn't leave the KCKPD police station until the evening of February 14, 2009.

**Golubski inserted Mr. Warren's name into the investigation as personal retaliation against the Warren family.**

64.    Around 1:21 a.m. on February 14, 2009, Captain Roger Golubski arrived at 3719 Webster and assumed command of the scene. Golubski remained as the supervisor throughout the entire investigation. Golubski reviewed and signed the investigating detectives' reports, initialing each page.

65.    On the morning of February 14, 2009, Golubski inserted Mr. Warren's name into the investigation as the main suspect—not due to information from Brandon or any other piece of evidence—but because Golubski had a vendetta against Mr. Warren's family.

66.    At some point before February 13, 2009, Mr. Warren's mother, Kathy Warren, had rejected Golubski's advances and solicitation of sex. She complained about Golubski to Mr. Warren's father, who threatened Golubski to stay away from his family.

67.    In retaliation and to assert his power, Golubski sought revenge on the Warren family and chose to pin the double homicide on the 18-year-old Mr. Warren, who Golubski had zero evidentiary basis to suspect was involved in the shooting.

68.    Golubski's targeting of Mr. Warren in this illegal and abusive manner was consistent with his decades-long misconduct and abuses of power.

**Golubski had a well-known history of abusing the Black community and framing innocent individuals to protect drug dealers he was in business with.**

69.    For decades, Golubski was an openly dirty cop and sexual predator who used the power of his badge to exploit, threaten, and abuse the Black community, especially Black girls and women. Golubski arrested, or threatened to arrest, women, sometimes without cause, and used the threat of prosecution to obtain sexual favors and information.

70.    In other instances, he would use his position in the KCKPD to fix tickets and make warrants disappear in exchange for sex. Though he would sometimes pay his victims with drugs or money, his preferred currency was compulsion.

71.    Golubski's predilections and abuses were well-known among KCKPD officers and supervisors. The squad room openly joked about his mistreatment of Black girls and women and the many offspring he was rumored to have fathered by them. It was widely known among KCKPD officers and supervisors that when Golubski went out on calls, he would arrest Black girls and woman, force them to give him sex—often at the precinct house itself—and release them without pressing charges.

72.    Golubski would often fixate on particular women, harassing them for months or even years. Once he gained leverage over a woman, he would demand that she carry out other acts for him including acting as confidential informants even though these women often knew nothing about the crimes or investigations.

73.    Additionally, Golubski worked closely with Kansas City, Kansas, drug kingpins to protect their interests. In exchange for sex, money, or drugs, Golubski fixed investigations, including by making cases and witnesses disappear and framing innocent people for crimes committed by the drug gangs.

74.   Golubski protected drug dealers by passing information to them about searches, informants, and ongoing investigations. Drug dealers and criminals paid Golubski for protection and information. He framed innocent people to protect known drug kingpins and criminals.

75.   Golubski was vindicative and would abuse his power when people didn't acquiesce to his demands and threats. For example, he sometimes asserted his power by targeting and/or falsely implicating the family members of people who tried to challenge or defy him.

76.   Golubski was known to use a network of unreliable informants to manufacture cases against innocent individuals. KCKPD officers and supervisors knew that the information coming from Golubski or his informants was unreliable because it was the product of his coercive relationships or a means of retaliation against people who challenged his authority. They also knew Golubski's information was unreliable because they understood Golubski shielded informants and drug dealers he worked with from arrest and investigation by framing innocent individuals.

77.   Golubski and his officers used whatever methods they chose to close cases and expended little or no effort to try to determine if the real perpetrator of a crime was arrested.

78.   Supervisors and detectives throughout the KCKPD knew that if they had a difficult case, they could come to Golubski for information because he could coerce his network of informants to say anything, even if it wasn't true. Although Golubski jealously guarded the identities of many of his informants; supervisors and other detectives knew that Golubski controlled his informants with the threat of arrest, violence, false conviction, or other consequences.

79.   Supervisors and detectives throughout the KCKPD also knew that Golubski would abuse his authority to clear warrants and make cases against his informants disappear in

exchange for sexual favors and information. Golubski regularly received assistance up and down the chain of command in order to provide those benefits.

80.     Golubski never sought to conceal his misconduct from KCKPD officers and supervisors. Although Golubski's corruption was common knowledge at the KCKPD, he was never reprimanded or punished and was instead promoted, becoming a captain before his retirement—which is the position he held when he oversaw the investigation into the homicides of Charles and Mr. LeDoux.

81.     The KCKPD did not welcome reports or complaints about officers, and the KCKPD never investigated Golubski for any of the rampant misconduct that he regularly engaged in over a period of decades. After Golubski retired, several current and former KCKPD officers blew the whistle on his gross misconduct. Multiple KCKPD officers have given sworn statements and provided testimony under oath describing Golubski's exploitation of vulnerable Black women and their families and the permissive or collusive supervision at the KCKPD that allowed him to get away with it.

82.     As just one example of Golubski's exploitation and misconduct, Golubski framed Lamonte McIntyre for a double homicide in retaliation for Mr. McIntyre's mother rejecting his sexual advances and harassment. Golubski and his officers coerced eyewitnesses to falsely identify the then 17-year-old innocent Mr. McIntyre as a killer. As a result, Mr. McIntyre was wrongfully convicted and spent 23 years in prison.

83.     In 2022, Golubski was indicted in two federal cases alleging civil-rights violations related to his flagrant abuse of power and criminal wrongdoing, including violence and sex trafficking of girls and women. He died by suicide on the morning that his federal trial was set to begin in 2024.

**Under Golubski's direction, Defendants targeted Mr. Warren.**

84.     Within hours of the shooting of Charles and Mr. LeDoux, under Golubski's supervision and direction and based not on actual evidence but on Golubski's corrupt agenda and his desire to retaliate against the Warren family, the KCKPD focused on Mr. Warren and an unnamed man in a red shirt as the sole crime suspects.

85.     By 11:30 a.m. on February 14, 2009, the morning after the shooting, the only information that Defendants had obtained from Brandon is that one shooter had short hair and a dark complexion, and the other shooter had braids and a brownish complexion. And Defendants had no other leads or information about the shooting.

86.     Yet, at 11:30 a.m., KCKPD Detective Dion Dundovich reported that Block informed him that two suspects had been identified that needed to be located: Cedric Warren and a second unknown male in a red shirt with medium dark skin, close cropped hair, and hair on his chin.

87.     At that point in the investigation, there was zero evidence linking the homicides to Mr. Warren or to a man in a red shirt. Brandon had not named Cedric Warren by name, nickname, or description. Brandon had also not mentioned or described a man in a red shirt with hair on his chin. No evidence existed that linked the shooting to Mr. Warren or a man in a red shirt with hair on his chin.

88.     Dundovich reported that he tried to locate Mr. Warren by tracking his phone and coordinating with the Kansas City, Missouri Police Department to search for Mr. Warren in an area where Mr. Warren was supposedly last seen, and that soon after that, officers located Mr. Warren nearby at a house at 2025 Lawn Avenue.

89.     This was false. In actuality, the KCKPD had located Mr. Warren at 2025 Lawn Avenue, based on information that Golubski received from the owner of the 2025 Lawn house— Tracy Mays, who, on information and belief, was one of Golubski's informants. Mr. Moore, who was wearing a red shirt, had also been observed at 2025 Lawn Avenue.

90.     Dundovich falsely reported the origin of Mr. Warren's whereabouts to conceal that the information originated not from Brandon or any other evidence, but instead from Golubski and his network of unreliable informants.

91.     Captain Bill Howard Jr. was Dundovich's supervisor, and he reviewed, approved, and signed Dundovich's report that contained these false representations.

92.     The house at 2025 Lawn Avenue was a neighborhood spot where people of all ages often gathered. The house was often under surveillance by the police.

93.     On the night of February 13, 2009, various different groups of children, teenagers, and adults were hanging out at 2025 Lawn. Many of them slept over.

94.     Mr. Warren and Mr. Moore were among the people at the house that night and the next morning; Mr. Warren had spent the night with his friend Damian, one of Ms. Mays's sons, and Mr. Moore was there with one of Ms. Mays's nieces, whom he was dating at the time.

**Defendants Block and Koberlein coerced Brandon into identifying Mr. Warren and a second suspect.**

95.     Even though the KCKPD had located Mr. Warren, who they wanted to frame for the shooting, they still had zero evidence connecting Mr. Warren to the murders, so they knew they had no basis to arrest him.

96.     To manufacture evidence implicating Mr. Warren in the shooting, Defendants Block and Koberlein continued to pressure Brandon.

97.    ***Brandon's fourth documented statement (reportedly taken at 1:52 p.m.).*** Just before 2:00 p.m., around 12 hours after they began interrogating Brandon, Defendants coerced Brandon into giving a more detailed, false statement about the shooting.

98.    In a recorded interview with Block and Koberlein, Brandon for the first time described the assailants as: (1) a Black, brown-skinned short male with a short fade and goatee, wearing a red shirt, blue jeans, and a red jacket, and holding a gun; and (2) a man with braids wearing a striped jacket and holding a handgun.

99.    Defendant Block also reported that Brandon affirmatively volunteered that the name of the guy wearing the striped jacket "might be Ced" and that Brandon knew him from the neighborhood around 61st and Farrow.

100.    Block's report was entirely false. Brandon only gave these suspect descriptions due to suggestion and pressure from Defendants Block and Koberlein. Defendants fed the false descriptions of both gunmen to Brandon.

101.    And Brandon never volunteered the name "Ced" (or any variation of it) to Defendants; Defendants also fed this information to Brandon.

102.    Mr. Warren's friends and neighbors primarily called him "Bobo" (not "Ced"), and Mr. Warren had never lived near 61st and Farrow.

103.    Brandon parroted exactly what Defendants told him to say, adopting the same police vernacular that Defendants used when suggesting the information to him. For example, in his statement, Brandon referred to his family members—his brother and brother-in-law—as the "deceased parties."

104.    Golubski reviewed and signed off on Block's police report detailing Block and Koberlein's interrogation of Brandon, which falsely claimed that Brandon—on his own and

without any suggestion or pressure—gave detailed descriptions of the assailants and volunteered that one might be named "Ced."

105.    This interview, which occurred around 2:00 p.m., was the first documented reference to Brandon mentioning "Ced" or a man in a red shirt and a red jacket.

106.    Yet, hours earlier at 11:30 a.m., Defendants Block and Koberlein had already advised Defendant Dundovich that Cedric Warren and a man in a red shirt were two suspects that needed to be located. Defendants knew at that time that this information came from Golubski, not Brandon, and that there was no evidence tying Mr. Warren or a man in a red shirt to the homicide.

107.    Defendants reported that at some point in the afternoon on February 14, 2009, they showed a photo array to Brandon that included a photo of Cedric Warren.

108.    The photo lineup didn't include any other individuals with names similar to "Ced," only Cedric Warren. And although Defendants reported that Brandon allegedly described one of the shooters as having braids, only two of the filler photos had braids.

109.    Block reported that he put Mr. Warren's photo in the array because he was familiar with Cedric Warren and his associates. But that was false; the real reason Block included a photo of Mr. Warren in the array was because Golubski directed him to do so.

110.    Due to direct pressure and coercion, Brandon identified the photo of Mr. Warren as the armed person he claimed he saw wearing a striped jacket.

111.    To bolster this coerced identification, Koberlein falsely reported in the arrest warrant affidavit for Mr. Warren that Brandon identified the voice of the person who allegedly said "where is the shit" as that of Mr. Warren's.

112.    This was entirely false. Brandon never told Defendants that he recognized the voice of the assailants and never identified the voice as Mr. Warren's.

113.    Defendants also fabricated that Mr. Warren had a motive for the shooting. Block falsely reported in an investigative report that Brandon said his brother and "Ced" may have had a little falling out. A search warrant application, based on false information provided by Defendants Block and Koberlein, also reported that Brandon had revealed that his brother had a "feuding relationship" with an individual known to Brandon as Ced or Cedric.

114.    This too was entirely false. Mr. Warren didn't know the Fords very well and never had a "falling out" or "feuding relationship" with any of them. As a result, Brandon never knew anything about a "falling out" and never volunteered that false information to Defendants.

**The KCKPD arrested Mr. Warren and Mr. Moore.**

115.    Defendants Block and Koberlein were on the scene at 2025 Lawn Avenue. Many people who had slept over at the house were there when the KCKPD arrived, including Mr. Warren and Mr. Moore.

116.    Block spoke alone to a couple of individuals at the house, including Ms. Mays's nephew, who Mr. Warren had been visiting. Block failed to document these interviews.

117.    At some point that afternoon, the KCKPD arrested Mr. Warren at 2025 Lawn Avenue.

118.    Later in the day, the KCKPD also arrested Mr. Moore, who had never even met Brandon or been to the house where the shooting occurred, at 2025 Lawn Avenue. When Mr. Moore was arrested, Mr. Moore was wearing a red shirt and a black jacket (not a red jacket, as Brandon's coerced interview stated) and was using a cane to help him walk.

**Defendant Slater coerced Brandon into identifying Mr. Moore.**

119.    After both Mr. Warren and Mr. Moore had been arrested, Block requested that Defendant Slater create a photo lineup with a photo of Mr. Moore. Defendant Slater presented a photo array of six black-and-white photos to Brandon. A photo of Mr. Moore was included in the array.

120.    Due to suggestion and pressure, Brandon stated that he thought he recognized a photo of Mr. Moore. But he asked for a more recent photograph of the suspect.

121.    Slater replaced the black-and-white photo of Mr. Moore with a more recent color photo of Mr. Moore wearing a red shirt. Slater didn't replace any of the other photos. Based on this blatant suggestion, Brandon identified Mr. Moore as one of the assailants.

122.    After the photo array was over, Slater led Brandon to his workstation where he had intentionally left the recent color photo of Mr. Moore on his computer screen so that Brandon would see it. Slater did this to underscore to Brandon that Mr. Moore was the "correct" suspect that the KCKPD wanted Brandon to identify. Slater falsely reported that leaving the photo on the screen was an accident and that he wasn't sure if Brandon had seen it.

**Immediately after Brandon's identifications, Defendants took Brandon to a mental health facility.**

123.    Defendants knew that Brandon had severe mental health problems and was in dire need of care and treatment. It was obvious from their 20-hour interaction that Brandon was severely mentally ill and completely unreliable.

124.    Yet Defendants never reported to the prosecutor any information about Brandon's mental health treatment and psychiatric history, so the defense and the jury never knew about it.

125.    After Brandon had been in the custody of the KCKPD for nearly 20 hours, Defendant Block transported Brandon from the police station directly to Rainbow Mental Health Facility so that Brandon could receive crisis psychiatric treatment.

126.    Defendants suppressed this information from the prosecutor and never disclosed that they had personally delivered Brandon to Rainbow Mental Health less than 24 hours after the shooting.

127.    When Brandon arrived at the mental health facility on the evening of February 14, 2009—less than 24 hours after the homicide—he was immediately assessed for emergency admission. The medical staff observed that Brandon suffered from confusion, paranoia, and cognitive impairment. The medical notes from his intake reflect that he was paranoid, easily distracted, anxiety laden, had impaired judgment and very poor insight, and was not considered to be a very reliable historian. The admission record notes his long-time diagnosis of schizophrenia as well as chronic paranoia. Brandon was unmedicated at the time.

128.    While a patient at Rainbow Mental Health Facility, Brandon expressed intense distress concerning his brother's murder. He described the murder as an event that was still haunting him. He experienced severe confusion and delusion and was not sure whether his thoughts were his or someone else's.

129.    Over the next several weeks, Brandon communicated to Rainbow Mental Health staff that he felt guilt over his family members' deaths and that the gunmen who killed his family were unknown—patently exculpatory statements that were unknown to the prosecutor and the defense because Defendants never documented or disclosed that Brandon had been admitted to the facility.

130.    The KCKPD had multiple undisclosed visits and calls with Brandon when he was a patient at Rainbow Mental Health facility. For example, on February 17, 2009, just three days after he had spent the entire day at the police station, Defendants Block and Koberlein spoke with Brandon on the phone about the homicide and also visited him at the facility. They told him they felt his safety was in danger.

131.    Defendants hid from the prosecutor their contacts with Brandon during the ensuing days and months after the homicide and before trial. They never reported that they had communicated with Brandon when he was a patient at the Rainbow Mental Health facility.

132.    In the months after the homicide, unbeknownst to the prosecutor and the defense, Brandon's mental health issues only intensified. For example, in 2009—after the homicide, but before Mr. Warren and Mr. Moore's trial—Brandon was arrested on drug charges and faced a second court-ordered competency evaluation.

133.    While in Wyandotte County Jail before and during trial, Brandon admitted to other people incarcerated in jail with him that he had no idea who shot at him and killed Charles and Mr. LeDoux. He admitted to one person that he only identified suspects due to police coercion and said that an officer showed him a photo and told him that somebody needed to pay for the shooting. Brandon also told another incarcerated man that he didn't even see the shooters and couldn't distinguish faces because he was high at the time of shooting. None of this was known by the prosecutor or defense at the time of trial.

**With Mr. Warren and Mr. Moore in custody, Defendants documented only minimal additional investigation.**

134.    Under Golubski's direction, Defendants were laser focused on Mr. Warren and Mr. Moore, who Defendants arrested within 24 hours of the homicide.

135.    If Defendants actually believed that Mr. Warren and Mr. Moore committed the shooting, they would have sought out more incriminating evidence against them—particularly because they knew Brandon did not see the shooting and his severe mental illness made him an unreliable witness.

136.    But after the arrests, Defendants either deliberately failed to investigate further or deliberately buried exculpatory evidence that they found.

137.    Defendants failed to document numerous basic investigative steps. For example, they didn't document any efforts to look for the getaway car, or the missing guns, money, or drugs.

138.    Brandon's brother Joe Ford reported to the police that Brandon had recognized the assailants' black SUV as belonging to their cousin Joe Freeman, and that Brandon had also mentioned Joe Freeman said he was going to "kill" Brandon's brothers just days before the homicides. Yet the police never documented an investigation into Joe Freeman and didn't even report locating or interviewing him.

139.    Police discovered around $950 from Mr. LeDoux's pocket and a black bag containing a small amount of cocaine hidden inside of a clothes dryer. But the KCKPD did not locate a bag of $20,000 or a kilo of cocaine that were reportedly being stored in the house. The KCKPD never documented a search for the missing money or drugs.

140.    In the KCKPD's search of the house where the shooting took place, the police recovered multiple gun magazines and a significant amount of ammunition, but they did not locate any guns inside the house. They found a gun on the porch but Defendants never connected it to the shooting. Defendants never documented a search for the 9mm Glock and AK-57 that Charles and Mr. LeDoux reportedly possessed.

141.    The KCKPD did not seek a search warrant for Mr. Warren or Mr. Moore's homes. If Defendants actually believed that Mr. Warren and Mr. Moore committed the shooting, they would have searched their houses for incriminating evidence. But Defendants knew they would not find anything inculpatory because they knew Mr. Warren and Mr. Moore were innocent.

142.    The police never took statements or documented interviews of the other individuals who were at 2025 Lawn on the night of the shooting or the morning after. Defendant Block spoke to several of these individuals, but he did not take their statements or document his conversations with them. The police never even documented a list of individuals who were at 2025 Lawn on the night of the homicide or the morning after.

143.    Defendants never documented any investigation as to how Brandon could've seen Mr. Moore run from the house to a black SUV, even though Mr. Moore's gait was impaired at the time and he was walking with a cane.

144.    Likewise, at the time of the shooting Cedric had visible injuries on his face. Had Mr. Warren actually been a gunman that Brandon had seen, Mr. Warren's injuries would have been visible to Brandon. But Brandon never reported seeing facial injuries or cuts. Defendants either never questioned Brandon about this or failed to document what he said.

145.    Defendants either made the intentional decision to conduct only minimal forensic testing—such as DNA, fingerprint, or ballistics testing—so as not to create exculpatory evidence, or they conducted the testing only to suppress it when they learned it was exculpatory.

146.    For example, the police didn't test the majority of Mr. Warren and Mr. Moore's clothing for gunshot residue or traces of blood, even though both individuals were arrested within 18 hours of the shooting.

147.    Defendants did test Mr. Warren and Mr. Moore's shoes for blood, but the results were exculpatory; no traces of blood were found on their shoes.

148.    Mr. Moore requested that the police test the rest of his clothing too, and a KCKPD Crime Scene Investigation officer also recommended that their clothes be tested for DNA. But Defendants refused to do so.

149.    If the police had truly wanted to find the true assailants, there is no reason why the police would not test all of the clothing of Mr. Warren or Mr. Moore. But the police did not want to find the true perpetrators. Defendants knew that Mr. Warren and Mr. Moore were innocent and that any further testing would be exculpatory, just like the forensic testing on their shoes.

150.    Additionally, the KCKPD collected hats and clothing from the crime scene. Forensic testing was conducted on one of the hats that was collected; the testing didn't detect any trace of blood or any DNA of Mr. Warren or Mr. Moore. But Defendants either did not conduct DNA testing on the other hat that was collected, or they buried the exculpatory evidence that the testing revealed.

151.    The police only obtained DNA samples from the deceased victims, Brandon, Mr. Warren, and Mr. Moore—no one else, not even Mr. Freeman.

**Mr. Warren and Mr. Moore were convicted and sentenced to 50 years in prison and later resentenced to 25 years in prison.**

152.    Brandon testified at preliminary hearings in Mr. Warren and Mr. Moore's cases. Brandon was extremely distressed and uneasy during his testimony. At the preliminary hearing in Mr. Warren's case, he was shaking and unsteady, and he threw up repeatedly in a trash can in between answering questions.

153.    Nonetheless, based on Defendants' misrepresentations about Brandon's identifications and in the dark to his severe psychiatric history and ongoing mental health treatment, the State pushed forward with the prosecution.

154.    Mr. Warren and Mr. Moore's case went to a joint trial that began on October 12, 2010.

155.    The State's case against Mr. Warren and Mr. Moore was flimsy and weak. The key evidence was Brandon's identification, which—even putting aside the myriad evidence that Defendants suppressed—was unreliable and contradictory.

156.    The whole case boiled down to whether Brandon was to be believed. The prosecutor explained to the jury: "The real question for you is, who did it? And to answer that question, you have to believe the testimony of Brandon Ford. … Do you believe Brandon Ford when he says the shooters that day were [Mr. Warren and Mr. Moore]?"

157.    At trial, Brandon identified Mr. Warren and Mr. Moore. But Brandon told a completely new story about what happened on the night of the homicide. For the first time, he testified that he was sitting on the couch when the gunmen entered the house—not in the bathroom as he had previously claimed. Even the prosecutor admitted that Brandon's testimony was inconsistent and conflicted with his prior statements.

158.    The State nonetheless argued that Brandon's testimony was credible and should be believed because Brandon had "never wavered" on who the shooters were, including when he spoke to detectives. And the State emphasized that Brandon had told Defendants Block and Koberlein that one of the shooters was "Ced," who he later identified as Mr. Warren. But this was not true; Defendants had falsely reported to the prosecutor that Brandon had positively

identified Mr. Warren and Mr. Moore without suggestion or pressure and that he had volunteered the name "Ced" on his own.

159.    The State also argued that Brandon identified the voice of one of the shooters as Mr. Warren's voice. But the State only made this argument based on a false representation from Defendant Koberlein; Brandon never actually said this.

160.    The only other evidence the State introduced against Mr. Warren and Mr. Moore at trial was that a gun reportedly used in the shooting was found in an air duct at the 2025 Lawn house.

161.    A State DNA expert testified at the trial that she had obtained from the grip of that gun a partial DNA profile that was consistent with a mixture of at least two individuals. The expert testified that the partial DNA profile was consistent with markers present in the DNA profile of one in every 31 people in the Caucasian population and one in every 43 people in the Black population, including Mr. Moore.

162.    This evidence was very weak on its face. The partial DNA profile was not a unique match to Mr. Warren or to Mr. Moore, and the expert described it as a "pretty common [DNA] profile." The expert admitted that the DNA quantity was very low; the DNA quality was degraded because it had been exposed to bacteria, dust, and mold; and she hadn't analyzed the majority of the loci from the DNA sample.

163.    At trial, Mr. Warren's father and stepmother testified for Mr. Warren and corroborated that he was with them on the night of the shooting. Mr. Warren's father testified that at the time of shooting, he was driving Mr. Warren to a sleepover at 2025 Lawn Avenue, which was more than 12 miles away from the shooting.

164.    Mr. Warren and Mr. Moore were found guilty on two counts of murder and one count of attempted murder.

165.    Mr. Warren and Mr. Moore were sentenced to life imprisonment with a hard 50 years for the first-degree murder conviction. Mr. Moore received sentences of 195 months and 155 months on the second-degree murder and attempted murder counts, to run concurrently. Mr. Warren received two 155-month sentences on the other two counts, also to run concurrently.

166.    After multiple appeals to the Kansas Supreme Court, Mr. Warren and Mr. Moore were ultimately resentenced to 25 years on the first-degree murder conviction, with their lesser convictions to run concurrently.

167.    The State's case relied only on unreliable and threadbare evidence and rested on Brandon's false account. Had the jury heard the false evidence and the exculpatory evidence that Defendants suppressed, Mr. Warren and Mr. Moore would not have been prosecuted, let alone convicted of these homicides.

168.    Had the jury learned that Brandon only identified Mr. Warren and Mr. Moore due to coercion and pressure from Defendants, Mr. Warren and Mr. Moore would not have been prosecuted or convicted.

169.    Likewise, had the jury learned that Brandon—the State's star witness—suffered from severe mental health history and was taken directly from the police station to a crisis psychiatric facility, Mr. Warren and Mr. Moore would not have been prosecuted or convicted.

170.    Had the jury learned that Brandon told mental health professionals that he did not know who killed his brothers, exonerating evidence that Defendants concealed, Mr. Warren and Mr. Moore would not have been prosecuted or convicted.

171.    Together, these pieces of evidence would have been devastating to the State's case. Mr. Warren and Mr. Moore would not have been prosecuted had the exculpatory evidence been documented and disclosed.

### Mr. Warren and Mr. Moore's convictions are vacated.

172.    In July 2024, the Wyandotte County Court held an evidentiary hearing on Mr. Warren's habeas petition. The court heard evidence in support of Mr. Warren's constitutional claim that the state withheld material information related to Brandon. The State didn't present any evidence in response.

173.    On December 9, 2024, the court granted Mr. Warren's petition and vacated his convictions.

174.    In the court's written order granting Mr. Warren's petition, the court explained that "Mr. Ford's credibility in front of the jury was everything" to the State's case. The court concluded that "[a]gainst all odds, the jury found Mr. Ford credible enough" for a conviction, but the court had "no doubt that the disclosure" of Brandon's health records would have made a difference in the verdict.

175.    The court reasoned that "[h]ad the evidence of Mr. Ford's severe mental health deficiencies been turned over," the State may not have chosen to prosecute at all.

176.    On December 11, 2024, the court also vacated Mr. Moore's convictions. On that same day, the State dismissed all charges against Mr. Warren and Mr. Moore, and Mr. Warren and Mr. Moore finally gained their freedom after more than 15 years of wrongful incarceration.

## **DAMAGES**

177.    Domonique Moore spent more than 15 years incarcerated for a crime he did not commit. He must now attempt to make a life for himself without the benefit of those life experiences and resources that normally equip adults for that task.

178.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Moore sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for more than 15 years; physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

179.    Additionally, the emotional pain and suffering caused by losing those years has been substantial. During his incarceration, Mr. Moore was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Mr. Moore missed out on the ability to share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as an autonomous human being.

180.    Because of the foregoing, Mr. Moore has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately

caused by Defendants' misconduct. These damages continue to date and will continue into the future.

## CLAIMS FOR RELIEF

## FEDERAL CAUSES OF ACTION

### COUNT I

**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation in Violation of the Fourth and Fourteenth Amendments**

*Against All Individual Defendants*

181.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

182.    Defendants, acting individually and in concert, and within the scope of their employment with the KCKPD, deprived Mr. Moore of his clearly established constitutional right to due process of law and to a fair trial.

183.    Defendants deliberately deprived Mr. Moore of his right to a fair trial by deliberately fabricating false inculpatory evidence and using coercion and/or undue suggestion to obtain a false inculpatory witness identification. Defendants then concealed the misconduct that had produced those statements. Defendants also fabricated inculpatory witness statements and suppressed exculpatory information, including that Golubski was the source of the identification of Mr. Warren and Mr. Moore.

184.    These Defendants deprived Mr. Moore of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation, evidence concerning the witness's significant and ongoing mental health history.

185.    Had Defendants' fabrications and material exculpatory and impeachment evidence known to them been documented and/or disclosed, they would have tended to prove Mr. Moore's innocence, cast doubt on the entire police investigation and prosecution, and impeached critical trial testimony. The exculpatory and impeachment evidence withheld by Defendants undermines confidence in the verdict against Mr. Moore, and the concealment of this evidence deprived Mr. Moore of a fair criminal trial.

186.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Moore's clearly established constitutional rights. No reasonable officer in 2009 would believe this conduct was lawful.

187.    The acts and omissions of Defendants, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Moore's injuries. These Defendants knew, or should have known, that their conduct would result in Mr. Moore's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT II**

**42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments**

*Against All Individual Defendants*

188.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

189.    Defendants, acting individually and in concert, with malice and knowing that probable cause did not exist to prosecute Mr. Moore for the murders of Charles Ford and Larry LeDoux and the attempted murder of Brandon Ford, intentionally caused Mr. Moore to be arrested, charged, and prosecuted for those crimes, thereby violating his clearly established right,

33

under the Fourth and Fourteenth Amendments to the U.S. Constitution, to be free of prosecution absent probable cause.

190.    Specifically, as described in detail above, Defendants, acting individually and in concert, fabricated inculpatory evidence and intentionally withheld and misrepresented exculpatory facts that they knew would have vitiated probable cause against Mr. Moore and they knew would have impeached witnesses for the prosecution at trial, including but not limited to the fact that Defendants coerced or otherwise fabricated the false eyewitness identification from the sole surviving witness. These actions caused Mr. Moore's continued confinement and prosecution.

191.    Mr. Moore is completely innocent of the murders of Charles Ford and Larry LeDoux and the attempted murder of Brandon Ford, and his arrest was not based on probable cause.

192.    The case finally terminated in Mr. Moore's favor on December 11, 2024, when all charges were vacated and dismissed and he was unconditionally discharged from custody.

193.    Mr. Moore suffered damages arising from his over 15 years of wrongful incarceration.

194.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Moore's clearly established constitutional rights. No reasonable officer in 2009 would have believed this conduct was lawful.

195.    The acts and omissions by Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Moore's injuries because these Defendants knew, or

should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Moore.

## COUNT III

### 42 U.S.C. § 1983 Failure to Intervene

*Against Defendants All Individual Defendants*

196.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

197.     By their conduct and under color of state law, Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Mr. Moore to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

198.     These Defendants' failures to intervene violated Mr. Moore's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police at the times relevant to this complaint would have believed that failing to intervene to prevent these Defendants from fabricating inculpatory evidence or causing Mr. Moore to be arrested and prosecuted without probable cause, were lawful.

199.     These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Moore's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Moore's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT IV**

**42 U.S.C. § 1983 Civil Rights Conspiracy**

*Against All Individual Defendants*

200.    Plaintiff hereby incorporates by reference all the foregoing paragraphs.

201.    Defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with others, including the coerced witnesses, to act in concert in order to deprive Mr. Moore of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, coercion, deprivation of liberty without due process of law, and to a fair trial, as well as depriving him of his Fourteenth Amendment rights of access to courts and executive clemency.

202.    In furtherance of the conspiracy, each Defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    Defendants worked in concert to compel fabricated eyewitness testimony falsely implicating Mr. Moore in the murder of Charles Ford and Larry LeDoux and failed to document and disclose material exculpatory evidence to prosecutors, including, without limitation, the fact that Brandon Ford's account was false and that the details of his account originated not with Brandon Ford, but with Golubski and investigators;

b.    Defendants worked in concert to fail to document and disclose from prosecutors material exculpatory and impeachment evidence, including, without limitation, Brandon Ford's severe mental health history and substance abuse, as well as Defendants' undocumented transport to and communications with him at a crisis psychiatric treatment facility; and

c.    Defendants worked in concert to fail to conduct forensic testing on

physical evidence so as to avoid the creation of exculpatory evidence and/or Defendants

worked in concert to suppress, withhold, and fail to disclose the exculpatory results of

forensic testing, including without limitation, DNA testing, ballistics testing, and

fingerprint testing.

203.    As a direct and proximate result of Defendants' actions, Mr. Moore was

wrongfully convicted and imprisoned for more than 15 years and suffered the other grievous

damages and injuries set forth above.

## COUNT V

## 42 U.S.C. § 1983 Supervisory Liability Claim

### *Against Defendants Golubski and Howard*

204.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

205.    Defendants Block, Koberlein, Dundovich, and Slater acted with impunity in an

environment in which they were not adequately supervised, disciplined, or trained by their

supervisors Defendants Golubski or Howard in this case and as a matter of practice.

206.    Defendants Golubski and Howard acted with gross negligence, recklessness,

and/or deliberate indifference to the constitutional rights of citizens by failing to provide

adequate training, supervision, and discipline of the Defendant Officers, and thereby caused the

individual Defendant Officers to deprive Mr. Moore of his clearly established constitutional

rights, including his rights to be free from false imprisonment, malicious prosecution, and

deprivation of liberty without due process of law, and his right to a fair trial.

207.    Had Defendants Golubski and Howard not provided grossly inadequate discipline,

supervision and training of the Defendant Officers, they would not have fabricated inculpatory

37

evidence, failed to disclose exculpatory evidence, and intentionally and maliciously caused Mr. Moore to be arrested and prosecuted without probable cause. Defendants Golubski and Howard were directly involved in the investigation of Mr. Moore and directly supervised the specific investigative acts taken by the KCKPD detective Defendants in this case.

208.    The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Golubski and Howard, all under color of state law violated their duty, which had been clearly established by 2009, to supervise Defendant officers, and no reasonable police supervisor by 2009 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

209.    As a direct and proximate result of Defendants' actions, Mr. Moore was wrongly convicted and imprisoned for more than 15 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Monell Claim

**Unconstitutional Customs, Policies, and Practices of Defendant Unified Government of Wyandotte County and Kansas City, Kansas**

*Against Defendant Unified Government of Wyandotte County*

210.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

211.    Defendant Unified Government was at all times relevant to this Complaint responsible for the polices, practices, and customs of the KCKPD. The Unified Government is the successor entity to the City of Kansas City, Kansas, which employed all of the individual Defendants in 2009.

212.    Defendant Unified Government, by and through its final policymakers, had in force and effect during the investigation of the Ford-LeDoux murders and for years before and after, a policy, practice, or custom of unconstitutional misconduct in serious felony investigations, including, in particular, the encouragement and use of coerced and unreliable witness statements taken by Defendant Golubski and other favored KCKPD officers, including Defendants Block and Koberlein.

213.    Defendant Unified Government, by and through its final policymakers had in force and effect during the investigation of the Ford-LeDoux murders and for years beforehand a policy, practice, or custom of deliberately withholding exculpatory and impeachment evidence from the prosecution and criminal defendants like Mr. Moore in violation of constitutional rights established by *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Specifically, KCKPD officials systematically failed to turn over evidence that would undermine the reliability of witnesses who had given false, coerced testimony due to pressure and suggestion on particularly vulnerable witnesses and/or due to the threat of arrest, physical violence, sexual domination, payment in drugs or money, or other consequences. KCKPD officials systematically failed to turn over evidence that investigating officers, including but not limited to Golubski, maintained relationships of sexual domination of witnesses in serious felony investigations, and that investigating officers, including but not limited to Golubski, retaliated against individuals and their families when his chosen targets did not succumb to his dominance.

214.    Defendant Unified Government by and through its final policymakers, had in force and effect during the Ford-LeDoux investigation and for years beforehand, a policy, practice, or custom of failing to adequately supervise, discipline and train officers investigating serious felonies.

215.    Final policymakers for the Unified Government had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into charges that KCKPD officers used the misconduct described above to close cases. Final policymakers for the Unified Government also had actual or constructive notice that widespread failures to supervise or discipline officers for misconduct committed during the course of serious felony investigations enabled officers to engage in misconduct without repercussion. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Domonique Moore.

216.    Despite repeated opportunities to do so during the Ford-LeDoux investigation and for years beforehand, final policymakers for the Unified Government failed to adequately supervise, discipline, and train officers for failing to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing informants; coercing informants and/or witnesses to provide false evidence; illegally protecting individuals involved in the illegal drug trade; failing to turn over exculpatory evidence to the prosecution and criminal defendants; and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases and/or as a retaliatory mechanism.

217.    The egregious acts of Golubski and other officers were deliberately ignored by KCKPD and the Unified Government as multiple officers and policymakers knew about the misconduct but either encouraged it or turned a blind eye. Final policymakers for the Unified Government knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to the use of false, fabricated or coerced testimony and perjury, false eyewitness reports, fabricated evidence, false identifications, wrongful arrests, malicious prosecutions, and wrongful convictions.

218.    Such unconstitutional municipal customs, practices and/or policies were the moving force behind Mr. Moore's arrest, prosecution, and over 15 years of wrongful incarceration, as well as all the other grievous injuries and damages set forth above.

## STATE LAW CLAIMS

### COUNT VII

### Malicious Prosecution under Kansas state law

*Against All Individual Defendants*

219.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

220.    Defendants initiated or continued proceedings against Mr. Moore without probable cause and with malice. Specifically, they intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors that vitiated probable cause, including but not limited to the facts that the incriminating witness statements were fabricated and the product of coercion, and that Defendants fed witnesses false details they did not know and could not have known, because Mr. Moore is innocent.

221.    The proceedings terminated in Mr. Moore's favor when his convictions were vacated on December 11, 2024. On December 11, 2024, the State moved to dismiss all charges and Mr. Moore was then released from prison after more than 15 years of wrongful incarceration.

222.    Defendants committed these acts within the scope of their employment.

223.    As a direct and proximate result of this malicious prosecution, Mr. Moore sustained the injuries set forth above.

224.    Plaintiff gave notice to Unified Government of Wyandotte County and Kansas City, Kansas by timely filing a notice of claim under KSA § 12-105b with the Unified Government clerk, and more than 120 days have elapsed without a response.

## COUNT VIII

### Intentional or Reckless Infliction of Emotional Distress under Kansas state law

*Against All Individual Defendants*

225.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

226.    Defendants intentionally and/or recklessly, and in breach of their duties owed to Mr. Moore, directly and proximately caused Mr. Moore, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than 15 years.

227.    Defendants caused Mr. Moore to suffer physical and emotional harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

228.    Plaintiff gave notice to the Unified Government of Wyandotte County and Kansas City, Kansas by timely filing a notice of claim under KSA § 12-105b with the Unified Government clerk, and more than 120 days have elapsed without a response.

## COUNT IX

### Negligent Infliction of Emotional Distress under Kansas state law

*Against All Individual Defendants*

229.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

230.    Defendants negligently and grossly negligently, and in breach of their duties owed to Mr. Moore, directly and proximately caused Mr. Moore, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for more than 15 years.

231.    Defendants caused Mr. Moore to suffer physical and emotional harm resulting from the circumstances and duration of Mr. Moore's wrongful arrest, prosecution, and incarceration.

232.    Plaintiff gave notice to the Unified Government of Wyandotte County and Kansas City, Kansas by timely filing a notice of claim under KSA § 12-105b with the Unified Government clerk, and more than 120 days have elapsed without a response.

## COUNT X

### Respondeat Superior Liability

*Against Defendant Unified Government of Wyandotte County*

233.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

234.    Defendants were at all times material to this complaint employees of the Unified Government of Wyandotte County and/or its predecessor, the City of Kansas City, Kansas and acted within the scope of their employment in committing the misconduct described above.

235.    Defendants' tortious conduct was undertaken while carrying out routine investigative functions. The conduct was reasonably expected by, and in fact foreseen by, Defendants' employer.

236.    Defendant Unified Government of Wyandotte County and Kansas City, Kansas, is liable as principal for all intentional torts committed by its agents.

237.    Plaintiff gave notice to the Unified Government of Wyandotte County and Kansas City, Kansas by timely filing a notice of claim under KSA § 12-105b with the Unified Government clerk, and more than 120 days have elapsed without a response.

## DESIGNATION OF PLACE OF TRIAL

Pursuant to D. Kan. Rule 40.2, Plaintiff requests Kansas City, Kansas as the place of trial.

WHEREFORE, Plaintiff Domonique Moore prays as follows:

A.      That the Court award compensatory damages to Plaintiff and against all Defendants;

B.      jointly and severally, in an amount to be determined at trial;

C.      That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

D.      For a trial by jury;

E.      For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

F.      For any and all other relief to which Plaintiff may be entitled.

Date: October 30, 2025                    Respectfully submitted,

                                          By: /s/ *Robert Hoffman*
                                          Robert Hoffman, KS # 16453
                                          Courtney M. Stout, KS # 28447
                                          One Kansas City Place
                                          1200 Main Street, Suite 3800
                                          Kansas City, MO  64105-2122
                                          Telephone:     +1 816 374 3200
                                          Facsimile:     +1 816 374 3300
                                          Email: Bob.Hoffman@bclplaw.com
                                          Email: Courtneym.Stout@bclplaw.com

Emma Freudenberger*
Nick Brustin*
Annie Sloan*
Grace Paras*
NEUFELD SCHECK BRUSTIN
HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014
(212) 965-9081
emma@nsbhf.com
nick@nsbhf.com
annie@nsbhf.com
grace@nsbhf.com
*Attorneys not yet admitted in the District of Kansas; applications to practice pro hac vice forthcoming