**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| DOMONIQUE MOORE,<br><br>        **Plaintiff,**<br><br>        v.<br><br>UNIFIED GOVERNMENT OF WYANDOTTE COUNTY AND KANSAS CITY, KANSAS, et al.,<br><br>        **Defendants.** | Case No. 25-2626-JAR-RES |

## MEMORANDUM AND ORDER

Plaintiff Domonique Moore filed this action on October 30, 2025, alleging claims under 42 U.S.C. § 1983 and Kansas law against the following Defendants: Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government"); Daphne Halderman, Special Administrator of the Estate of Captain Roger Golubski; Detective Bryan Block; Detective Darren Koberlein; Detective Randy Slater; Detective Dion Dundovich; and Captain Bill Howard, Jr., all in their individual capacities. Before the Court is Defendants' Motion to Dismiss for Failure to State a Claim (Doc. 32) as to Defendants Unified Government, Block, Koberlein, Slater, Dundovich, and Howard. The motion has been fully briefed, and the Court is prepared to rule. For the reasons stated below, Defendants' motion to dismiss is granted in part and denied in part.

## I.    Standard

Fed. R. Civ. P. 12(b)(6) provides for dismissal for failure to state a claim upon which relief can be granted. To survive a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations that, assumed to be true, "raise a right to relief above

the speculative level"[1] and include "enough facts to state a claim to relief that is plausible on its face."[2]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully," but requires more than "a sheer possibility."[3]

"[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[4] The Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[5]  The Court will view all well-pleaded factual allegations in the light most favorable to the plaintiff.[6]

Plaintiff alleges ten claims[7] in his Amended Complaint: (1) deprivation of liberty without due process of law and denial of fair trial by fabricating evidence, withholding material exculpatory and impeachment evidence, and deliberately failing to conduct a constitutionally adequate investigation in violation of the Fourth and Fourteenth Amendments; (2) malicious prosecution in violation of the Fourth and Fourteenth Amendments; (3) failure to intervene; (4) civil rights conspiracy; (5) supervisory liability claim; (6) unconstitutional customs, policies, and practices of Defendant Unified Government; (7) malicious prosecution under of Kansas law; (8) intentional or reckless infliction of emotional distress under Kansas law; (9) negligent infliction of emotional distress under Kansas law; and (10) respondeat superior liability.  Defendants

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] *Id.* at 570.

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[5] *Iqbal*, 556 U.S. at 678.

[6] *Jordan-Arapahoe, LLP v. Bd. of Cnty. Comm'rs of Cnty. of Arapahoe, Colo.*, 633 F.3d 1022, 1025 (10th Cir. 2011).

[7] Not all of Plaintiff's claims are brought against every Defendant.  The Court makes clear in the Discussion section which Claims are alleged against which Defendants.

Unified Government, Block, Koberlein, Slater, Dundovich, and Howard move to dismiss all claims under Fed. R. Civ. P. 12(b)(6).

## II.    Background

The following facts are alleged in the First Amended Complaint[8] and assumed to be true for purposes of deciding the instant motion.

In October 2010, Domonique Moore and Cedric Warren[9] were convicted in Wyandotte County District Court for the February 13, 2009 murders of Charles Ford ("Charles") and Larry LeDoux and the attempted murder of Brandon Ford ("Brandon").  Moore was sentenced to life imprisonment with a mandatory minimum of 50 years for first degree murder.  On December 11, 2024, the Wyandotte County District Court vacated Moore's convictions.  On that same day, the State of Kansas dismissed all charges against Moore.  In total, Moore spent 15 years, 9 months, and 25 days incarcerated for crimes he did not commit.  He was 24 years old at the time of his arrest.

### *The February 13, 2009 Shooting*

On the evening of February 13, 2009, Charles, LeDoux, and Brandon were staying in a known drug-house at 3719 Webster Street, Kansas City, Kansas ("3719 Webster").  Charles and Brandon were brothers, and LeDoux was their brother-in-law.  Deshawn Bryant was the owner of 3719 Webster and cousins with Charles, Brandon, and LeDoux, but he was out of town that night.  That evening, Charles and LeDoux were armed with a loaded 9mm Glock and a loaded AK-57, respectively.  With them at 3719 Webster: a kilo of cocaine and $20,000 cash.

---

[8] Doc. 55.

[9] The Court notes Warren is the plaintiff in a nearly identical lawsuit arising from the same underlying wrongful conviction as Moore.  *See Warren v. Unified Gov. of Wyandotte Cnty., et. al.*, Case No. 2:25-cv-02625-JAR-RES (D. Kan. 2025).

Just before midnight, gunmen entered 3719 Webster.  Immediately thereafter, Charles and LeDoux exchanged gunfire with the shooters.  After the gunfire cleared, Brandon observed the gunmen fleeing 3719 Webster and entering a black SUV.  Brandon then fled 3719 Webster with a gun in hand himself.  Brandon began alerting neighbors for help; two neighbors dialed 9-1-1.  One neighbor reported hearing gunshots and reported a black man with a gun came to his door saying someone was shooting at him; another neighbor reported that someone came to their house seeking help because he had been shot at.  No neighbors reported seeing a black SUV or anyone other than Brandon with a gun.  Charles and LeDoux died at the scene.

### *Brandon's Initial Statements to the Police*

Brandon provided to the Kansas City, Kansas Police Department ("KCKPD") various statements concerning the shooting.  Brandon's statements were rife with contradictions and provided at the behest and coercion of KCKPD detectives.  Brandon's initial statements regarding the February 13, 2009 shooting are detailed chronologically below.

At 11:57 p.m., Brandon provided the police with his first statement.  Four minutes after the first emergency call to the police, KCKPD officers found Brandon a few blocks from 3719 Webster.  There, Brandon told the responding officers that his name was "Joseph Ford," and that he was scared because "guns had gone off."[10]  Brandon told the responding officers that a friend had taken him to McDonald's and had just dropped him off at 3719 Webster when people started shooting at him as he approached the house.

Shortly after midnight, Brandon provided the police with his second statement.  This time, the responding officers brought Brandon to their squad car, where a different officer interviewed him.  In this interview, Brandon admitted he was "Brandon Ford" and not "Joseph."

---

[10] Doc. 55 ¶ 57.

Brandon then admitted to being inside 3719 Webster at the time of the shooting. However, Brandon said he was unable to provide a description of the shooters because he was in the bathroom at the time of the shooting and never saw the shooters. At the instruction of the responding officers, Brandon remained in the squad car until the detectives-in-charge arrived. Homicide Detectives Darren Koberlein and Bryan Block were assigned to the case and arrived on scene before 1:00 a.m. on February 14, 2009.

Sometime between midnight and 2:17 a.m., Brandon provided Koberlein and Block with his third statement. According to a police report authored by Block, Brandon told Koberlein that he was inside 3719 Webster with Charles and LeDoux when a black SUV pulled up to the house and two unknown individuals got out. Brandon went to the bathroom when Charles opened the door. From the bathroom, Brandon heard someone shouting, "where is the shit," trailed by the sound of gunshots. Brandon then ran to a nearby bedroom, shut the door behind him, grabbed a gun hidden in that room, and exchanged gunfire through the closed bedroom door with the gunmen.

According to Block's report, Brandon provided to Koberlein the following descriptions of the gunmen: (1) a guy with short hair and dark complexion, and (2) a guy with brownish complexion wearing braids. Neither Block nor Koberlein reported any additional descriptions by Brandon. Despite Brandon's insistence that he did not know who the shooters were and could not provide any additional description, Koberlein and Block transported Brandon to the KCKPD police station and interrogated him the entire next day until Brandon's release on the evening of February 14, 2009.

5

### *Roger Golubski Arrives On Scene*

Around 1:21 a.m. on February 14, 2009, Captain Roger Golubski arrived at 3719 Webster.  Golubski took command of the scene and remained the supervisor throughout the investigation.  As supervisor, Golubski reviewed and signed the investigating detectives' reports, initialing each page during his review.  It was Golubski who first input Warren's name into the investigation.

On the early morning of February 14, 2009, Golubski directed his detectives to focus their investigation on Warren as the main suspect of the shooting.  No other detective had yet mentioned Warren as a suspect.  Prior to the shooting, Warren's mother, Kathy Warren, rejected Golubski's solicitation for sex.  She informed Warren's father of Golubski's sexual advances, who subsequently threatened Golubski to stay away from his family.  However, Golubski instead sought to exact revenge against the Warrens for their defiance.  The shooting offered Golubski an opening for this revenge, and he took it: he pinned the double-homicide and attempted murder on then-18-year-old Warren.

Golubski's framing of Warren was consistent with Golubski's storied abuse that was well-known throughout the KCKPD.  KCKPD officers and supervisors knew Golubski was a serial sexual predator and dirty cop who spent decades openly leveraging the power of his badge to threaten, abuse, and prey on the Kansas City, Kansas community, with a particular focus on terrorizing Black women and girls.  In fact, the KCKPD squad room openly joked about the many rumored children Golubski fathered throughout Kansas City, Kansas during his decades of openly using the job to feed his predilections.

Indeed, Golubski would arrest many of these women and force them to perform sexual acts for him at the KCKPD precinct, then release them without ever filing charges.  In other

instances, he would leverage his power as a KCKPD detective to fix tickets and vanish warrants in exchange for sex. And while Golubski would occasionally pay off his victims with drugs or money, his favored currency was compulsion.

Moreover, Golubski was well-known for utilizing a network of unreliable informants to manufacture cases and convictions. Many of Golubski's informants stemmed from his relationships with drug kingpins and dealers, who paid Golubski for protection and information on searches, informants, and ongoing investigations. KCKPD officers and supervisors knew Golubski would routinely abuse his power to clear warrants for his informants and to receive sexual favors.

However, the KCKPD did not welcome reports or complaints about its officers, and the KCKPD never investigated Golubski or his subordinate officers for any of the rampant misconduct that they regularly engaged in for decades. After Golubski retired, several current and former KCKPD officers blew the whistle on his gross misconduct. Multiple KCKPD officers have given sworn statements and provided testimony under oath describing Golubski's exploitation of vulnerable Black women, girls, and their families, and KCKPD's permissive or collusive supervision that allowed him to openly continue his abuse throughout his career.

KCKPD officers and supervisors knew the information provided by Golubski and his network was unreliable. But KCKPD officers and supervisors also knew that if they had a tough case, they could ask Golubski for information because he would coerce his network of informants to say anything, regardless of truth. And in fact, they did. Golubski and his officers openly closed cases via whatever means available, expending little to no time or effort in search of a crime's real perpetrator. As a result, Golubski rose through the ranks of the KCKPD,

stacking promotions, never reprimanded, punished, or investigated by the KCKPD for his abuse and corruption.

### Detectives Target Warren

At Golubski's direction, detectives now focused their investigation on Warren and an unknown man in a red shirt. On February 14, 2009, the only information Brandon provided the detectives with was that there were two shooters: one with short hair and a dark complexion, and the other with braids and a brownish complexion. Detectives possessed no other information or leads at that time.

Yet, later that morning, at 11:30 a.m., KCKPD Detective Dion Dundovich reported that Block had informed him that two suspects had been identified: Warren and an unknown male in a red shirt with medium dark skin, close cropped hair, and hair on his chin. At this point in the investigation, KCKPD detectives had no evidence linking the shooting to Warren or the unknown man in a red shirt. Indeed, Brandon had not yet mentioned Warren by name, alias, or description, nor had Brandon described any other individual in a red shirt with hair on his chin.

Dundovich reported that he attempted to locate Warren via phone tracking and coordination with the Kansas City, Missouri Police Department in an area Warren was allegedly last seen, and that this effort resulted in officers locating Warren at a house at 2025 Lawn Avenue. However, Dundovich's report was a lie. Instead, KCKPD officers located Warren at 2025 Lawn Avenue due to information from one of Golubski's informants: Tracy Mays, the owner of 2025 Lawn Avenue. Dundovich made the false report to conceal that the information originated from a Golubski informant and not Brandon. Dundovich's supervisor, Captain Bill Howard Jr., reviewed, approved, and signed the false report.

On the night of February 13, 2009, various groups of children, teenagers, and adults were gathered at 2025 Lawn Avenue. 2025 Lawn Avenue was a well-known get-together spot in its neighborhood. People of all ages gathered, and police often surveilled the house for this reason. That night, many of the people hanging out at 2025 Lawn Avenue slept there until the next morning, including Warren and Moore. Warren spent the night with his friend, Damian, who was Mays's son. Moore spent the night with his then-girlfriend, who was Mays's niece; Moore was wearing a red shirt during his visit.

Despite locating Warren, the KCKPD had zero evidence connecting Warren or this unidentified man in a red shirt to the shooting, so they did not make an arrest at that time. Instead, Block and Koberlein returned to Brandon for information.

### Brandon's Fourth Statement to the Police

Around 1:52 p.m. on February 14, 2009, Block and Koberlein sought a more detailed, fourth statement from Brandon. In a recorded interview, nearly 12 hours after they first began interrogating him, Brandon described, for the first time, the assailants as: (1) a Black, brown-skinned, short male with a short fade and goatee, wearing a red shirt, blue jeans, and a red jacket, holding a gun; and (2) a man with braids wearing a striped jacket and holding a handgun. Block also reported Brandon identified the man in the striped jacket as possibly being named, "Ced," as Brandon knew him from the neighborhood near 61st and Farrow.

Block's report was a lie. Block and Koberlein fed Brandon false descriptions of the gunmen, including the name "Ced," and pressured Brandon into regurgitating their false account. Warren's nickname to family and friends was actually "Bobo," and Warren had never lived near 61st and Farrow. Brandon parroted the detectives down to their argot. For example, in his statement, Brandon referred to Charles and LeDoux, *his brothers*, as the "deceased parties."

9

Golubski reviewed, approved, and signed Block's report detailing these lies. Notably, Brandon gave his fourth statement hours *after* Block and Koberlein had already advised Dundovich of Warren and the man in a red shirt.

At some point later that same afternoon, detectives showed Brandon a photo array that included Warren. The array didn't include any other individuals with names like "Ced," and, although KCKPD officers reported that Brandon allegedly described one of the shooters as having braids, only two of the photos contained an individual with braids. Block reported that he put Warren's photo in the array due to his familiarity with Warren and his associates. This was another lie; Block included Warren's photo at Golubski's directive.

After hours of direct pressure and coercion, Brandon identified Warren as the man in the striped jacket. Even further, Koberlein correspondingly reported in the arrest warrant affidavit for Warren that Brandon identified Warren's voice as the person who allegedly said, "where is the shit." This was another lie. Brandon never told anyone that he recognized the voice of an assailant, nor did he ever identify the voice as Warren's.

Finally, Block also falsely reported that Warren had a motive for the shooting. Block reported that Brandon said Charles and "Ced" may have had a little falling out. But Brandon never volunteered this information to the detectives, because this information did not exist. Warren did not know the Ford brothers well, nor did he ever have a "falling out" or "feuding relationship" with Charles. Nonetheless, Block and Koberlein grafted this lie into a search warrant application that stated Brandon had revealed a "feuding relationship" between Charles and a man known to Brandon as "Ced."

10

### *The KCKPD Arrest Warren and Moore*

On February 14, 2009, within 24 hours of the shooting, KCKPD officers arrested Warren and Moore. Block and Koberlein were on scene at 2025 Lawn Avenue. Block spoke alone to some of the individuals who were at the house, including Warren's friend, Damian. Block did not document these interviews. KCKPD officers first arrested Warren and then arrested Moore later the same day. At the time of his arrest, Moore was using a cane to walk and was wearing a red shirt and a black jacket (not a red jacket).

After arresting Warren and Moore, Block asked Detective Randy Slater to create a photo lineup that included a photo of Moore to show to Brandon. Slater did so and presented Brandon with a photo array of six black and white photos, one being of Moore. Due to suggestion and pressure, Brandon stated he might recognize the photo of Moore, but that he'd need a more recent photo of the individual. Slater replaced the black and white photo of Moore with a recent color photo of Moore wearing a red shirt. Slater did not replace the other original five photos that were still black and white. It was at this point Brandon finally identified Moore as one of the shooters.

After concluding the photo array, Slater led Brandon to his workstation where he had intentionally left the recent color photo of Moore on his computer screen, in plain view of Brandon. Slater did this to emphasize for Brandon that Moore was the "correct" suspect that the KCKPD intended Brandon to identify. Slater would falsely report that leaving Moore's photo on the screen was an accident and he wasn't even sure if Brandon noticed it.

### *Brandon's Mental Health*

After 20 hours, the detectives no longer needed Brandon at the station. And during their time with Brandon, the detectives knew Brandon clearly suffered from severe mental health

11

problems and needed medical care and treatment.  As such, Block transported Brandon from the police station directly to Rainbow Mental Health Facility so Brandon could receive crisis psychiatric treatment.  No one with the KCKPD ever informed the prosecutor that detectives delivered Brandon to a mental health facility less than 24 hours after the shooting; the prosecutor, defense attorneys for Warren and Moore, and the jury never learned of Brandon's mental health treatment and psychiatric history.

After arriving at the mental health facility, the medical staff assessed Brandon for emergency admission, observing Brandon's confusion, paranoia, and cognitive impairment. Medical notes from Brandon's intake detail that he was paranoid, easily distracted, anxiety laden, had impaired judgment and very poor insight, and was not considered to be a very reliable historian.  And the admission record notes his long-time diagnosis of schizophrenia and chronic paranoia.  Brandon was unmedicated at this time.

Over the next several weeks, Brandon told Rainbow Mental Health staff that he felt guilt over his brothers' deaths and that the gunmen who killed Charles and LeDoux were unknown. However, these statements were never shared with the prosecution or the defense because KCKPD officers never documented or disclosed that Brandon had been admitted to the facility. In fact, Block and Koberlein suppressed their multiple visits and calls with Brandon while he was a patient.  For example, three days after detectives interrogated Brandon for 20 hours, Block and Koberlein spoke with Brandon on the phone about the homicide and visited him at the facility.  During these conversations, Block and Koberlein told Brandon they felt his safety was in danger.

KCKPD detectives hid their visits with Brandon from the prosecutor during the days and months after the shooting and before Warren and Moore's trial.  And during this time period,

Brandon's mental health crisis intensified. In 2009—after the shooting but before Warren and Moore's trial—Brandon was arrested on drug charges and faced a second court-ordered competency evaluation. While Brandon was in Wyandotte County Jail for this arrest, and before and during Warren and Moore's trial, Brandon admitted to other incarcerated individuals that he had no idea who the shooters from the February 13, 2009 shooting were. In fact, Brandon admitted to one person that he only identified the suspects because of police coercion and said that an officer showed him a photo and told him that somebody needed to pay for the shooting. Brandon also told another incarcerated person that he never saw the shooters and couldn't even distinguish faces at the time of the shooting because he was so high. Neither the prosecution nor the defense learned of this information before or during the trial.

### *The Post-Arrest Investigation*

After arresting Warren and Moore, the KCKPD either deliberately failed to investigate further or deliberately buried exculpatory evidence that they discovered. Despite knowing Brandon suffered from severe mental illnesses and only provided statements at their coercion, the KCKPD failed to meaningfully investigate further. And importantly, KCKPD officers failed to document many basic investigative steps; for example, detectives never documented any efforts to search for the black SUV, guns, money, or drugs.

Brandon's brother, Joe Ford ("Joe"), reported to KCKPD officers that Brandon had recognized the shooters' black SUV as belonging to their cousin, Joe Freeman. Joe also reported that Brandon mentioned that Freeman told him he planned to "kill" Brandon's brothers just days before the shooting. Yet the police never documented an investigation into Freeman and never even reported locating or interviewing him.

13

At the scene, KCKPD officers discovered around $950.00 in LeDoux's pocket and found a black bag that contained a small amount of cocaine hidden inside of a clothes dryer. But no officer ever reported locating the bag of $20,000 or kilo of cocaine that was allegedly stored at 3719 Webster. And while KCKPD officers recovered multiple gun magazines and ammunition at 3719 Webster, they never found guns in the house; they did find a gun on the porch but never connected this gun to the shooting. In fact, no one with KCKPD ever even documented searching for the 9mm Glock and AK-57 that Charles and LeDoux reportedly possessed.

Nor did any KCKPD officer ever seek any search warrants for Warren's and Moore's homes. They never took statements or documented interviews of the other individuals who were at 2025 Lawn Avenue on the night of the shooting or the morning after. And while Block spoke to some of these individuals, he did not take their statements or document his conversations. No officer ever even documented a list of individuals who were at 2025 Lawn Avenue on the night of and morning after the shooting.

Glaringly, KCKPD detectives never documented investigating how Brandon could have seen Moore running to the black SUV despite knowing Moore's gait was so impaired that he needed a cane to walk. And, the KCKPD never reported investigating whether Brandon noticed a shooter as having noticeable facial injuries and marks, as Warren did at the time of the shooting. KCKPD did not take these basic investigative steps, because they knew all of their information came from Golubski, not Brandon, and that they were seeking facts to support Golubski's narrative.

KCKPD also failed to take basic forensic measures. KCKPD officers and analysts only obtained DNA samples from Charles, LeDoux, Brandon, Warren, and Moore—no one else, not even Freeman. Further, the KCKPD never tested the majority of Warren's and Moore's clothing

14

for blood or gunshot residue, despite arresting them only a day after the shooting (and with Moore seemingly in the same red shirt). And the clothing they did test was exculpatory: KCKPD tested Warren's and Moore's shoes for traces of blood, finding none.

In fact, Moore requested the KCKPD test the rest of his clothing as well, and a KCKPD Crime Scene Investigation Officer even recommended granting Moore's request. But they never did. The KCKPD also collected numerous hats and articles of clothing from 3719 Webster, but decided to only test a single hat, which failed to identify any traces of blood or DNA of Warren and Moore.

### *Warren and Moore are Tried and Sentenced*

On October 12, 2010, Warren and Moore's joint trial began. Despite Brandon's distressed testimony at the preliminary hearings, which included Brandon's shaking and repeated vomiting between answers, the prosecution was still unaware of Brandon's mental health history and proceeded to trial. The prosecution's case rested entirely on Brandon's testimony. As the prosecutor explained to the jury: "The real question for you is, who did it? And to answer that question, you have to believe the testimony of Brandon. . . . Do you believe [Brandon] when he says the shooters that day were [Warren and Moore]?"[11]

Brandon identified Warren and Moore to the jury. But in doing so, he presented an entirely new narrative of what happened on the night of February 13, 2009. For the first time, Brandon told the jury he was sitting on the living room couch when the shooters entered 3719 Webster, not in the bathroom, not walking up the front steps, and not shooting through a closed bedroom door.

---

[11] Doc. 55 ¶ 156.

15

And while the State acknowledged Brandon's inconsistencies, the State asked the jury to nonetheless believe Brandon because he never wavered on the identities of the shooters, including when he provided statements to the detectives. The State evidenced Brandon's reliability by referencing Brandon's consistent identifications of Warren and Moore and statements about a man named "Ced." The State also asked the jury to rely on Brandon's fabricated voice identification of Warren.

Finally, the State's only other evidence against Warren and Moore was that a gun reportedly used in the shooting was found in an airduct at 2025 Lawn Avenue. However, the State's DNA expert testified that the DNA from the grip of that gun was consistent with a mixture of at least two individuals: the partial DNA profile was consistent with markers present in the DNA profile of 1 in every 31 people in the Caucasian population, and 1 in every 43 people in the Black population, which included Moore. The State's expert admitted the DNA was low in quantity and poor in quality. Further, Warren's father and stepmother testified that Warren was with them the night of the shooting. Warren's father testified that, at the time of the shooting, he was driving Warren to a sleepover at 2025 Lawn Avenue, which was more than 12 miles from 3719 Webster.

Warren and Moore were found guilty on two counts of murder and one count of attempted murder. Both were sentenced to life imprisonment with a hard 50 years for the first-degree murder conviction. Moore received sentences of 195 months and 155 months on the second-degree murder and attempted murder counts, to run concurrently. Warren received two 155-month sentences on the other two counts, also to run concurrently. After several appeals to the Kansas Supreme Court, Warren and Moore were re-sentenced to 25 years on the first-degree murder convictions, with their lesser convictions to run concurrently.

### *Convictions Vacated*

In July 2024, the Wyandotte County District Court conducted an evidentiary hearing on Warren's habeas petition. The court heard evidence in support of Warren's constitutional claim that the State withheld material information related to Brandon. The State chose not to present any evidence in response.

On December 9, 2024, the court granted Warren's habeas petition and vacated his convictions. In its written Order, the court emphasized that "[Brandon's] credibility in front of the jury was everything" to the State's case, concluding that "[a]gainst all odds, the jury found [Brandon] credible enough" for a conviction, but that the court had "no doubt that the disclosure" of Brandon's health records would have resulted in a different verdict. The court noted that "[h]ad the evidence of [Brandon's] severe mental health deficiencies been turned over," the State may not have chosen to prosecute at all. Two days after vacating Warren's convictions, the court also vacated Moore's convictions. In the end, Warren and Moore regained their freedom after enduring 15 years, 9 months, and 25 days of incarceration for crimes they did not commit.

## III.    Discussion

The Court now considers the moving Defendants' motion to dismiss the ten claims alleged against them under Fed. R. Civ. P. 12(b)(6).[12] First, the Court addresses the individual Defendants' qualified immunity defenses. Second, the Court addresses the Unified Government's argument that Plaintiff failed to sufficiently plead *Monell* liability. Because the Court declines to dismiss all claims over which it has original jurisdiction, it need not address Defendants' request that the Court decline supplemental jurisdiction over the state-law claims.

---

[12] Plaintiff, in his opposition to Defendants' motion to dismiss, voluntarily dismisses the following claims against the following Defendants, which is also reflected in Plaintiff's subsequently filed Amended Complaint: Count II (malicious prosecution) against Dundovich; Count III (failure-to-intervene) against Slater; and Counts I (due process), II (malicious prosecution), and III (failure to intervene) against Howard. Doc. 44 at 8 n.3.

17

### A.    42 U.S.C. § 1983 Individual-Capacity Claims and Qualified Immunity Defenses

The individual Defendants raise the defense of qualified immunity against Plaintiff's § 1983 claims (Counts I–V).  Defendants argue Plaintiff failed to adequately plead specific actions taken by particular Defendants, or specific policies over which particular Defendants possessed supervisory responsibility, that violated their clearly established constitutional rights, thus entitling Defendants to qualified immunity.

A plaintiff may bring a civil cause of action under 42 U.S.C. § 1983, which requires "(1) deprivation of a federally protected right by (2) an actor acting under color of state law."[13]  Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.[14]  To this end, qualified immunity shields government officials from individual liability unless the plaintiff shows (1) the defendant's violation of a constitutional right; and (2) that the right the official violated was "clearly established" at the time of the challenged conduct.[15]

Accordingly, the qualified immunity defense must be resolved "at the earliest possible stage of a litigation."[16]  For a court to resolve the issue of qualified immunity at the earliest possible stage of litigation, the complaint must allege enough facts to make clear the grounds on which the claim rests.[17]  Once a defendant has "asserted the defense of qualified immunity, the

---

[13] *Doe ex rel. Doe v. Rocky Mountain Classical Acad.*, 99 F.4th 1256, 1259 (10th Cir. 2024) (quoting *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016)).

[14] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

[15] *Id.* at 735.

[16] *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987)).

[17] *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007)).

burden is on [p]laintiffs to establish their right to proceed."[18]  If a plaintiff fails to carry that burden, "the defendant prevails on the defense."[19]

The procedural posture of the Court's qualified immunity examination is critical.[20]  At the motion to dismiss stage, defendants are subjected to "a more challenging standard of review" than would apply at the summary judgment stage.[21]  On a motion to dismiss, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for [constitutionality]."[22]  As such, a qualified immunity defense asserted in a Rule 12(b)(6) motion to dismiss generally presents two questions: 1) whether the plaintiff has alleged facts showing a constitutional violation; and 2) whether that constitutional violation was clearly established or obvious at the time of the incident in question.[23]  The Court applies this framework below to the Claims and defenses at issue in the motion to dismiss.

### 1.    Due Process Claim (Count I)

Defendants Block, Koberlein, Slater, and Dundovich argue Plaintiff fails to adequately allege his due process claim, entitling them to immunity.  Plaintiff alleges Block, Koberlein, Slater, and Dundovich violated his due process rights under the Fourth and Fourteenth Amendments by (1) fabricating evidence, and (2) withholding material exculpatory and impeachment evidence.  First, the Court addresses whether Plaintiff adequately alleges a

---

[18] *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *Bledsoe v. Carreno*, 53 F.4th 589, 617 n.25 (10th Cir. 2022) ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was [plaintiff's] burden to show both that he had alleged a constitutional violation and that that violation was clearly established.").

[19] *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016).

[20] *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022).

[21] *Id.*

[22] *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

[23] *See VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1159, 1175 (10th Cir. 2021).

constitutional injury as to each Defendant.  If so, the Court addresses whether the alleged

constitutional violation was clearly established or obvious at the time of the incident in question.

To plausibly allege a fabrication claim, Plaintiff must adequately plead facts showing:

> (1) the defendant knowingly or recklessly fabricated evidence, (2)
> the fabricated evidence was used against the plaintiff, (3) the use of
> the fabricated evidence deprived the plaintiff of liberty, and (4) if
> the alleged unlawfulness would render a conviction or sentence
> invalid, the defendant's conviction or sentence has been
> invalidated or called into doubt.[24]

To plausibly allege a withholding claim under *Brady*, a plaintiff must adequately allege facts

demonstrating "(1) the government—through a prosecutor, an investigator, a law enforcement

officer, or some other 'arm[ ] of the state'—suppressed evidence; (2) the evidence is favorable to

the accused; and (3) the evidence is material to the defense."[25]

### a.  Block

Plaintiff alleges Block knowingly or recklessly fabricated evidence when he (1) filed his

police report documenting Brandon's fourth statement on February 14, 2009; (2) coerced

Brandon into identifying Warren and an unknown male wearing a red shirt, blue jeans, and a red

jacket; and (3) inserted Warren's photo into a photo array at Golubski's directive and lied that he

did so because of his familiarity with Warren.  Plaintiff alleges Block suppressed material

exculpatory evidence when he suppressed (1) evidence of Brandon's poor mental health during

the interrogation; (2) his contact with Brandon at the mental health facility; and (3) his

misconduct throughout the investigation.  The Court addresses each due process claim in turn.

---

[24] *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (footnotes omitted); *see also*, *Brady v. Maryland*, 373 U.S. 83, 88 (1963).

[25] *Coones v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty.*, 166 F.4th 1, 17 (10th Cir. 2026) (alteration in original) (quoting *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995)).

On the fabrication claim, Block argues Plaintiff failed to plausibly allege that (1) Block knew any suspect information he received was false or that he deliberately misattributed statements to Brandon, and (2) that Block knew any information allegedly provided by Golubski was false, fabricated, or unreliable at the time. Block does not dispute that Plaintiff's allegations meet fabrication elements 2–4, so the Court need only address the first element: whether Plaintiff adequately alleges Block knowingly or recklessly fabricated evidence. On this knowledge element, Plaintiff may satisfy his burden by adequately alleging actual knowledge or reckless disregard for the truth.[26]

Plaintiff alleges the following facts support Block's knowledge about the fabricated evidence: (1) Block authored a police report rife with lies; (2) Block coerced Brandon into providing an identification of Warren and a second suspect, despite lying in his report that Brandon volunteered this information on his own without suggestion; (3) Block advised Dundovich to locate Warren and a man in a red shirt due to a suggestion from Golubski, not based on Brandon's statement as he claimed; (4) Block inserted Warren's photo into the array at Golubski's direction and lied that he did so simply because he was familiar with Warren and his associates; and (5) Block falsely reported that Brandon described to him a falling out between his brother and "Ced," which created a fabricated motive against Warren and the unknown assailant.

Block replies that Plaintiff relies too much on the assertion that Golubski supplied the fabricated information, and that he fails to allege *Block's* knowledge. However, as described above, Plaintiff also alleges Block's actual knowledge that his report contained lies. For example, Plaintiff specifically alleges that Block falsely reported to the prosecutor that Brandon

---

[26] *See Bledsoe v. Carreno*, 53 F.4th 589, 612 (10th Cir. 2022) (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1285 (10th Cir. 2004)).

volunteered the name "Ced" on his own.  The allegation that Golubski supplied fabricated

information in fact supports Block's knowledge: if Block was aware that information came from

Golubski and not Brandon, yet stated in his report that it came from Brandon, this creates a

reasonable inference that Block knew he made a statement in his report that was not true.  As

such, these allegations sufficiently plead that Block had actual knowledge or recklessly

disregarded the truth in his report.[27]

On the *Brady* claims, Block again argues Plaintiff failed to allege that Block had actual

knowledge, but Block misunderstands what level of scienter is required.  Civil liability for

a *Brady* violation may arise when police officers suppress favorable, material evidence either

"knowingly or with reckless disregard for the truth."[28]

And Plaintiff does allege Block knowingly, or with reckless disregard for the truth,

suppressed material exculpatory evidence regarding Brandon's significant and ongoing mental

health history.  For example, Plaintiff alleges the prosecutor at trial emphasized to the jury that

their verdict overwhelmingly rested on their belief in Brandon's testimony, thus evidence of

Brandon's mental capacity is necessarily material.  Certainly, Plaintiff explicitly alleges that

Block, immediately after interrogating Brandon for nearly 20 hours, transported Brandon to a

mental health facility after recognizing Brandon's severe mental health problems during the

course of his interrogation, subsequently visited and contacted Brandon at that same mental

health facility, and then failed to disclose any of this information to the prosecutor prior to,

during, or after the trial.

---

[27] *Bledsoe v. Jefferson County*, 275 F. Supp. 3d 1240, 1254 (D. Kan. 2017) (explaining fabricating evidence is a clearly established constitutional violation).

[28] *Coones*, 166 F.4th at 17 (quoting *Pierce*, 359 F.3d at 1298).

Block attempts to obfuscate what is required at this stage by arguing that: "Plaintiff does not allege that Block knew of [Brandon's] mental health history beyond transporting him to a mental health facility. Nor [does Plaintiff] allege facts showing Block knew that [Brandon] told mental health professionals he did not know who killed his brother."[29] Block's argument is unavailing for two reasons. To start, Plaintiff plausibly alleges that Block had knowledge of Brandon's material mental health status when he decided it prudent to take Brandon directly to a mental health facility after interrogating him for nearly 20 hours.

Also, Plaintiff need not allege facts showing Block knew that Brandon told mental health professionals he did not know who killed his brother. Instead, Plaintiff sufficiently alleges that Block's withholding of Brandon's transportation to a mental health facility immediately after his 20-hour interrogation, and his continued contact with Brandon at that facility, particularly in light of the importance of Brandon's testimony at trial, was a suppression of material exculpatory evidence. The fact that Brandon's admissions to his doctors might have also come to light had Block not suppressed this evidence does not negate Block's knowledge of Brandon's poor mental health. As such, Plaintiff's *Brady* claim sufficiently alleges Block violated Plaintiff's constitutional rights.

### b. Koberlein

Plaintiff alleges Koberlein knowingly or recklessly fabricated evidence when he (1) filed his arrest warrant affidavit; (2) coerced Brandon into identifying Warren and an unknown male wearing a red shirt, blue jeans, and a red jacket; (3) and falsely represented Brandon's voice identification of Warren. Plaintiff alleges Koberlein suppressed material exculpatory evidence when he (1) suppressed evidence of Brandon's poor mental health during the interrogation; (2)

---

[29] Doc. 32 at 4.

his contact with Brandon at the mental health facility; (3) and his misconduct throughout the investigation.  The Court addresses each due process claim in turn.

First, like Block, Koberlein only addresses the first element on the fabrication claim: whether Plaintiff adequately alleges Koberlein knowingly or recklessly fabricated evidence. Koberlein argues Plaintiff's allegations against him mirror those against Block and support impermissible group pleading.  The Court agrees that the allegations against Block and Koberlein are largely similar, but the Court finds that Plaintiff sufficiently tailors his allegations against Koberlein to support Count I.  Importantly, Plaintiff alleges that Block and Koberlein were partners and conducted the investigation together.

Plaintiff alleges Koberlein knew he falsely reported Brandon's voice identification of Warren, and that Koberlein made this false report to bolster Brandon's coerced identification of Warren and the unknown assailant.  Plaintiff also alleges Koberlein knowingly falsely reported Brandon's statements regarding a person named, "Ced" and that person's feuding relationship with his brother.  And while Koberlein argues Plaintiff relies too much on the assertion that Golubski supplied fabricated information at the outset of the investigation, thus failing to allege *Koberlein's* knowledge, for the same explanation above as to Block, Plaintiff sufficiently alleges Koberlein fabricated evidence. Thus, at this procedural stage, these allegations sufficiently plead Koberlein violated Plaintiff's constitutional rights.[30]

Second, Koberlein's arguments against Plaintiff's *Brady* allegations repeat Block's and fail for the same reasons.  Plaintiff alleges Koberlein knew Brandon was receiving mental health care but suppressed this evidence and his continued contact with Brandon at the mental facility

---

[30] *Bledsoe v. Jefferson County*, 275 F. Supp. 3d 1240, 1254 (D. Kan. 2017) (fabricating evidence is a clearly established constitutional violation); *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004).

from the prosecution. Such an argument is likewise unavailing for the same reason Block's argument failed. At this procedural stage, Plaintiff's *Brady* theory sufficiently alleges Koberlein violated Plaintiff's constitutional rights.

### c. Slater

Plaintiff alleges Slater (1) knowingly or recklessly fabricated evidence when he coerced Brandon into falsely identifying Plaintiff via a photo array, and (2) suppressed material exculpatory evidence when he suppressed evidence of his misconduct during the investigation. The Court addresses each due process claim in turn.

First, Slater argues Plaintiff fails to adequately allege that Slater was aware of other officers' misconduct and thus could not have knowingly fabricated evidence. However, Plaintiff does allege that Slater coerced Brandon into identifying Plaintiff when he conducted the photo array and then falsely reported Brandon's identification at that photo array as a positive identification made without pressure or suggestion. Taking Plaintiff's allegations as true, this is enough to allege a constitutional violation.

Second, Plaintiff alleges Slater knowingly or recklessly suppressed evidence of his own misconduct, including his fabrication of evidence and witness coercion. In response, Slater argues Plaintiff's *Brady* theory necessarily fails because Plaintiff fails to adequately allege that Slater fabricated evidence. However, as the Court explained above, Plaintiff's fabrication allegations are sufficient; thus, so is Plaintiff's allegation that Slater violated his *Brady* rights by suppressing evidence of that fabrication.[31] Accordingly, at this procedural stage, Plaintiff's *Brady* theory sufficiently alleges Slater violated Plaintiff's constitutional rights.

---

[31] *Scott v. City of Tulsa*, 775 F. Supp. 3d 1190, 1208 (N.D. Okla. 2025) (finding allegations sufficiently plead a *Brady* violation where the defendants withheld evidence of their witness coercion). Plaintiff generally asserts this *Brady* theory against all Count I Defendants, but Defendants do not explicitly address this theory in their opening brief. Such an argument would nonetheless fail because the predicate fabrication allegations all survive at

### d. Dundovich

Plaintiff alleges Dundovich (1) knowingly or recklessly fabricated evidence when he falsely reported that he located Warren via phone tracking and coordination with the Kansas City, Missouri Police Department in order to conceal the fact that Golubski actually provided him Warren's whereabouts because Dundovich knew of Golubski's history of retaliation and fabrication, and (2) suppressed material exculpatory evidence when he suppressed evidence of his misconduct during the investigation. The Court addresses each due process claim in turn.

First, Dundovich argues Plaintiff fails to allege that Dundovich knowingly fabricated evidence, and instead impermissibly relies on information provided Golubski provided to Dundovich. However, Plaintiff does allege Dundovich knowingly fabricated evidence when he reported that he located Warren via phone tracking and coordination with Kansas City, Missouri Police Department, in order to conceal the fact that it was Golubski who injected Warren's whereabouts into the investigation. This is important because Plaintiff was at 2025 Lawn Avenue the same evening as Warren. Further, Plaintiff alleges Dundovich knowingly sought to hide Golubski's role in identifying Warren and Plaintiff, because Dundovich knew Golubski was well-known for providing unreliable information stemming from his coercive relationships and desire to retaliate against people in the Kansas City, Kansas community. Taking Plaintiff's allegations as true, this is sufficient to allege a constitutional violation.

Second, Plaintiff alleges the same *Brady* theory against Dundovich as he does against Slater. Dundovich does not address this theory in his motion, but any argument would nonetheless fail for the reasons stated above.

---

this stage. However, to the extent Defendants do address this theory for the first time in their reply brief, this argument is waived. *See, e.g.*, *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief.") (quoting *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009))).

### e. Clearly Established

Finally, because the Court has found Plaintiff adequately alleges constitutional violations based on fabrication and withholding against each of the above Defendants, the Court must now inquire whether the alleged constitutional violations were clearly established or obvious at the time of the incident in question. A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate."[32] But a court shouldn't "define clearly established law at a high level of generality."[33]

"Ordinarily, to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[34] But "a government official may still have notice that their conduct violates a constitutional right [when] it is so apparent as to apply with obvious clarity."[35] "In this regard, the Supreme Court has reminded us recently that under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful."[36]

---

[32] *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation modified).

[33] *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

[34] *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (citation modified).

[35] *Brown v. City of Tulsa*, 124 F.4th 1251, 1265 (10th Cir. 2025).

[36] *Frasier*, 992 F.3d at 1015 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam)); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("The degree of specificity required from prior case law depends in part on the character of the challenged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").

Defendants do not contend that either constitutional violation was not clearly established or obvious prior to 2009, nor could they.[37]  As such, Defendants Block, Koberlein, Slater, and Dundovich are not entitled to qualified immunity on Count I, and their motion to dismiss these Claims is denied.

### 2.    Malicious Prosecution Claim (Count II)

Plaintiff alleges Defendants Block, Koberlein, and Slater caused his prosecution without probable cause and with malice when each Defendant fabricated evidence and withheld exculpatory evidence.  Block, Koberlein, and Slater argue Plaintiff fails to adequately allege a constitutional violation, entitling them to qualified immunity.  The Tenth Circuit analogizes § 1983 malicious prosecution claims to the common law tort of malicious prosecution for the purpose of determining the elements of the claim: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages."[38]  All three Defendants contend Plaintiff fails to adequately allege the probable cause and malice elements.  Slater also challenges the causation element.

The Tenth Circuit has explained that "[p]robable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."[39]  When assessing probable cause, "the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more

---

[37] *Bledsoe v. Carreno*, 53 F.4th 589, 612 (10th Cir. 2022).

[38] *McCarty v. Gilchrist*, 646 F.3d 1281, 1285 (10th Cir. 2011).

[39] *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) (citation modified).

than a bare suspicion."[40]  "Officers must consider the totality of the evidence known to them when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause."[41]

"[O]rdinarily, the statement of a victim of a crime to police may establish probable cause absent some reason to think the statement not trustworthy."[42]  "If the police have 'reason to think the statement [is] not trustworthy,' however, then the police cannot rely on an uncorroborated victim statement to establish probable cause."[43]  In the context of fabricated or withheld evidence, like Plaintiff alleges here, the inquiry is "whether, 'without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would be no probable cause for [Plaintiff's] continued confinement or prosecution."[44]

Malice requires that a defendant acted either knowingly or recklessly.[45]  "Malice may be inferred if a defendant causes the prosecution without arguable probable cause."[46]  Additionally, the Tenth Circuit has explained that "the failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative

---

[40] *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) (quoting *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011)).

[41] *Id.* (quoting *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004) (citation modified)).

[42] *Cortez v. McCauley*, 478 F.3d 1108, 1121 (10th Cir. 2007).

[43] *Coones v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty.*, 166 F.4th 1, 29 (10th Cir. 2026) (quoting Cortez, 478 F.3d at 1121).

[44] *Bledsoe v. Carreno*, 53 F.4th 589, 614–15 (10th Cir. 2022) (quoting *Pierce*, 359 F.3d at 1295).

[45] *Sanchez v. Hartley*, 810 F.3d 750, 756 (10th Cir. 2016).

[46] *Bledsoe*, 53 F.4th at 615 (alteration in original) (quoting *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014)).

evidence rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to be token negligence at most."[47]

### a. Block

Plaintiff alleges all of the evidence initially implicating Warren and the unknown assailant in the investigation was clearly untrustworthy as it stemmed from coerced and fabricated statements from an obviously unreliable witness. As against Block, Plaintiff alleges Brandon simply parroted the information fed to him by Block, and that Block coerced Brandon into making a false identification of Warren. Additionally, Plaintiff alleges Slater created the photo lineup shown to Brandon that included his photo at Block's request. Plaintiff alleges these facts demonstrate Block's knowledge that there would be no probable cause to support Plaintiff's prosecution absent this fabricated evidence. Indeed, Block offers nothing beyond the coerced statements and fabricated evidence to support probable cause. So, setting aside the allegedly coerced and fabricated statements as the Court must, nothing is left to support probable cause for Plaintiff's prosecution.[48]

Plausibly plead factual allegations that a defendant either knew a statement was untrue or acted in reckless disregard for the truth satisfies the malice requirement.[49] Here, Plaintiff plausibly alleges Block actively coerced false statements and identifications from Brandon and fabricated evidence. In response, Block argues Plaintiff fails to show malice by merely alleging participation in an investigation and reliance on witness statements. The Court agrees with

---

[47] *Stonecipher*, 759 F.3d at 1142 (alteration omitted) (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).

[48] *Wilkins v. DeReyes*, 528 F.3d 790, 801 (10th Cir. 2008), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022) (finding an absence of probable cause for a malicious prosecution claim where the officers relied entirely on allegedly coerced false statements).

[49] *Sanchez*, 810 F.3d at 756.

Block that participation alone would not show malice, but Plaintiff offers more.  Plaintiff specifically alleges Block knowingly coerced false statements from a witness and fabricated evidence that Block then relied on to justify Plaintiff's prosecution.  Even further, Block had reason to at least question the reliability of Brandon's constantly changing stories as Block decided it appropriate to transport Brandon to a mental health facility after interviewing him.  As such, Plaintiff plausibly alleges a constitutional violation against Block.

### b.  Koberlein

Plaintiff alleges Koberlein fed Brandon the information he wanted Brandon to parrot in his statement, and that Koberlein coerced Brandon into making a false identification.  For example, Plaintiff alleges Koberlein knew he falsely reported Brandon's voice identification of Warren, and that Koberlein made this false report to bolster Brandon's coerced identification of Warren and the unknown assailant.  Plaintiff also plausibly alleges Koberlein made a knowingly false report that Brandon made statements regarding a person named "Ced" and that person's feuding relationship with his brother.  Koberlein offers nothing in response.  Removing the coerced and fabricated evidence, nothing is left to support probable cause.

Like Block, Plaintiff plausibly alleges Koberlein went beyond the malice threshold by actively coercing false statements and identifications from Brandon and fabricating evidence. Koberlein contends Plaintiff fails to allege facts showing that Koberlein knowingly provided false evidence.  The Court disagrees and again notes that actual knowledge is not required.[50] Plaintiff specifically alleges that Koberlein knew of Brandon's concerning mental health that underscored his various, contradicting statements, and that Koberlein manipulated Brandon into

---

[50] *See Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) ("It is a violation of the Fourth Amendment for an arrest warrant affiant to 'knowingly, or with reckless disregard for the truth,' include false statements in the affidavit." (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978))).

31

corroborating the very false information Koberlein utilized to support probable cause.  As such, Plaintiff plausibly alleges a constitutional violation by Koberlein.

### c.  Slater

Plaintiff alleges Slater coerced Brandon into identifying Plaintiff when he conducted the photo array, at Block's request, and then falsely reported Brandon's identification at that photo array as a positive identification absent pressure or suggestion.  Like Block and Koberlein, Slater offers no argument that probable cause still exists once the coerced statements and identifications and fabricated evidence are removed; as such, Slater's argument on this front is unavailing.  Plaintiff also alleges Slater knew his conduct during the photo array extracted a false identification of Plaintiff.  And Slater does not provide argument in response to this allegation.  The Court finds Plaintiff plausibly alleges a lack of probable cause and malice.

Finally, Slater argues that participation in an isolated investigative step does not satisfy the causation requirement for a malicious prosecution claim.  However, Slater cannot hide behind the fact that he neither initiated Brandon's interview nor arrested Plaintiff.[51]  Plaintiff plausibly alleges Slater coerced the prosecution's most important witness into falsely identifying Plaintiff and then lied about the veracity of that photo identification to continue Plaintiff's prosecution.  It is irrelevant for the purposes of causation that other government officials who conducted Plaintiff's investigation also maliciously abused their positions of trust "to induce the criminal justice system to confine and then to prosecute an innocent defendant."[52]  The Court views all types of this conduct "as equally repugnant to the Constitution."[53]

---

[51] *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004) ("The actions of a police forensic analyst who prevaricates and distorts evidence to convince the prosecuting authorities to press charges is no less reprehensible than an officer who, through false statements, prevails upon a magistrate to issue a warrant.").

[52] *Id.*

[53] *Id.*

As such, Plaintiff plausibly alleges his malicious prosecution claim against Slater, and Slater is not entitled to qualified immunity on this claim.

### d.  Clearly Established

Plaintiff has also demonstrated the second prong of the qualified immunity analysis on the malicious prosecution claim—that it was clearly established at the time of the investigation. Well before the February 14, 2009 shooting investigation was underway, the Tenth Circuit "held in *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), that '[n]o one could doubt that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986, in the context of information supplied to support a warrant for arrest.'"[54]  In sum, Defendants Block, Koberlein, and Slater are not entitled to qualified immunity on Count II, and their motion to dismiss this claim is denied.

### 3.     Failure to Intervene Claim (Count III)

Plaintiff alleges Count III against Defendants Block, Koberlein, and Dundovich.  Block, Koberlein, and Dundovich argue Plaintiff failed to adequately allege his failure-to-intervene claim, and that the facts alleged do not demonstrate a violation of clearly-established law, entitling them to qualified immunity.  The Tenth Circuit has recognized a claim for failure to intervene under § 1983 because "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."[55]  To show a constitutional violation, Plaintiff must demonstrate the following elements: "1) a government officer violated [Plaintiff's] constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about

---

[54] *Sanchez*, 810 F.3d at 759 (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004)).

[55] *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022) (quoting *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)).

that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so."[56]

### a. Constitutional Violation

Here, Plaintiff alleges all the necessary elements of a failure-to-intervene claim as to each Defendant.  First, as detailed above, Plaintiff alleges Block, Koberlein, and Dundovich all individually violated his constitutional rights, including through fabricating evidence, suppressing exculpatory evidence, and maliciously prosecuting him without probable cause. Second, Plaintiff alleges each Defendant knew of another's ongoing constitutional deprivations. Plaintiff alleges Block and Koberlein investigated the case together, jointly coercing Brandon into making false statements, and both suppressing that they transported Brandon to a mental health facility immediately following his interrogation.  The Court finds that a reasonable inference can be made from the evidence that Block and Koberlein witnessed each other's constitutional violations during their joint investigation.

Plaintiff also alleges Dundovich had knowledge of Golubski's constitutional violations; indeed, Plaintiff plausibly alleges Dundovich lied about tracking Warren's phone to 2025 Lawn Avenue in order to cover up that it was Golubski who actually injected this information into the investigation via one of his informants, the owner of 2025 Lawn Avenue, as means of exacting his retribution against the Warren family.  Third, and finally, Plaintiff alleges over a year separated the night of the murders and the beginning of Plaintiff's trial, giving Defendants reasonable opportunity to intervene and prevent Plaintiff's wrongful conviction, yet no Defendant did so.

---

[56] *Id.*

### b. Clearly Established

The question, then, is whether Plaintiff's right to have Block, Koberlein, and Dundovich intervene at their respective junctures was clearly established at the time of their investigation. The Court agrees with Defendants that the law was not clearly established in 2009. In 2022, the Tenth Circuit reversed a district court's decision denying qualified immunity on a failure-to-intervene claim in the context of allegations that law enforcement officers fabricated inculpatory evidence, withheld exculpatory evidence, and maliciously prosecuted the plaintiff.[57] The court explained that in 1999, when the investigation at issue occurred, the court had not recognized a failure-to-intervene claim at all.[58] And, prior to 2022, the Tenth Circuit had only recognized in published decisions that this claim applied in the excessive force context.[59] For the first time in *Bledsoe*, the Tenth Circuit made clear that a failure-to-intervene claim can apply to other constitutional violations:

> We hold that a failure-to-intervene claim is not limited to excessive force violations, but can involve other underlying constitutional violations. Specifically, here, Bledsoe adequately alleged a violation of his constitutional rights premised on Defendants' failure to intervene in the alleged fabrication of evidence against Bledsoe, the suppression of exculpatory evidence that would have proven his innocence, and the malicious arrest, prosecution, and conviction of Bledsoe without probable cause to believe he was guilty.[60]

Plaintiff has therefore not met his burden of showing that it was clearly established in 2009 that Defendants had a duty to intervene outside of the excessive force context.[61]

---

[57] *Id.* at 617.

[58] *Id.*

[59] *Id.* at 616–17 (collecting cases); *see Vondrak*, 535 F.3d at 1210.

[60] *Id.* at 617.

[61] *See id.*; *see also Shaw v. Schulte*, 36 F.4th 1006, 1020–21 (10th Cir. 2022) ("[W]here the intrusion and permanency of harm from the use of excessive force may exceed that from the relatively brief prolongation of a

However, Plaintiff makes another argument that was not addressed in *Bledsoe*: that it would have been obvious to any objectively reasonable officer that they had a duty to intervene and stop the constitutional violations in this case under *Hope v. Pelzer*.[62]  As the Court has explained, even if there is no Supreme Court or Tenth Circuit decision on point, a plaintiff can meet this prong under *Hope* by showing it is obvious.  Under *Hope*, a right may be clearly established if it would have been obvious to a reasonable officer, despite the lack of on-point authority recognizing a failure-to-intervene claim outside of the excessive force context.[63]  But "*Hope*'s holding historically has been applied to only the 'rare "obvious case,"' involving 'extreme circumstances,' or 'particularly egregious' misconduct."[64]  On this point, Plaintiff argues *Atchison v. City of Tulsa* is persuasive, and the Court agrees.[65]

In *Atchison*, the court addressed at summary judgment whether a detective's duty to intervene "would have 'been obvious to any objectively reasonable law enforcement officer'" where the detective could have intervened when another detective provided a witness with false information and then coerced a false statement by threatening him with the death penalty during an interview.[66]  The defendant did not respond to this argument.  The court denied qualified immunity and found that this duty would have been obvious in 1991, particularly in light of the

---

traffic stop, *Vondrak* does not clearly establish that an officer must intervene to prevent an illegal search and seizure. Accordingly, Mr. Bosire has not overcome the second prong of Trooper Schulte's qualified-immunity defense.").

[62] 536 U.S. 730, 741 (2002).  In *Bledsoe*, the plaintiff did not make that argument, so the court did not address it. 53 F.4th at 617.

[63] *Hope*, 536 U.S. at 741.

[64] *Frazier v. Evans*, 992 F.3d 1003, 1021 (10th Cir. 2021) (first quoting *District of Columbia  v. Wesby*, 583 U.S. 48, 64 (2018); and then quoting *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020)).

[65] *Atchison v. City of Tulsa*, No. 21-CV-286-JDR-SH, 2025 WL 2444597, at *11 (N.D. Okla. Aug. 25, 2025) (addressing *Bledsoe*).

[66] *Id.* (quoting *Bledsoe*, 53 F.4th at 617).

defendant detective's testimony that police officers are often required to take an oath to uphold the law, which includes being honest.[67]

While the issue here is presented at the earlier, less demanding Rule 12(b)(6) stage, the Court agrees with the *Atchison* court's holding.  First, like in *Atchison*, Defendants do not respond to Plaintiff's argument concerning *Hope*.  Second, the Court finds that the state of the law during Defendants' investigation gave Defendants fair warning that their alleged conduct was obviously unconstitutional.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful but it is to say that in the light of pre-existing law, the unlawfulness must be apparent."[68]

The present facts are the kind the Supreme Court had in mind in *Hope* when it discussed conduct so clearly and obviously wrong that the conduct itself unmistakably "should have provided [Defendants] with some notice" that their alleged conduct violated Plaintiff's constitutional rights.[69]  Plaintiff sufficiently alleges that Block and Koberlein coerced false statements from the prosecution's key witness and suppressed exculpatory evidence of that same witness's hospitalization for mental health concerns, and that Dundovich admitted to fabricating evidence that protected a supervising detective who had a well-known history for framing innocent individuals and leveraging his power as a police officer to sexually prey on the community and retribute against those who rejected his sexual advances.

The fact that this exact fact pattern may not have been addressed by the Supreme Court or Tenth Circuit does not mean Defendants should be immune.  "The easiest cases don't even arise. There has never been. . . . a section 1983 case accusing welfare officials of selling foster children

---

[67] *Id.*

[68] *Hope*, 536 U.S. at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (citation omitted).
[69] *Id.* at 745.

into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability."[70]  "Try as we might, [the Court] cannot conceive of circumstances in which [police officers] would not know and understand that they could not" coerce false statements, fabricate evidence, bury exculpatory evidence, and lie to protect a vindictive cop's search for retribution by framing an innocent man.[71]  As such, Block, Koberlein, and Dundovich are not entitled to qualified immunity on this claim.

### 4.    Conspiracy Claim (Count IV)

Defendants Block, Koberlein, Slater, Howard, and Dundovich argue Plaintiff failed to adequately allege his conspiracy claim, entitling them to qualified immunity.  To prevail on a conspiracy claim under § 1983, Plaintiff "must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient."[72]  The Court has already found that Plaintiff sufficiently plead deprivation of his constitutional rights on the due process, malicious prosecution, and failure to intervene claims, so now the Court must determine if he sufficiently demonstrated a conspiracy.

For the conspiracy, there must be "at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective."[73]  "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim."[74]  Rather, the Tenth Circuit demands specificity to plead conspiracy.

---

[70] *United States v. Lanier*, 520 U.S. 259, 271 (1997) (alterations in original) (quoting 73 F.3d 1380, 1410 (6th Cir. 1996) (Daughtrey, J., dissenting)).

[71] *Hardwick v. County of Orange*, 844 F.3d 1112, 1120 (9th Cir. 2017).

[72] *Snell v. Tunnell*, 920 F.2d 673, 701 (10th Cir. 1990) (quoting *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990)).

[73] *Frazier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (quoting *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010)).

[74] *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998).

"A § 1983 plaintiff must 'make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.'"[75]

At this procedural juncture, the Court concludes that Plaintiff has alleged a cognizable conspiracy theory in part. Plaintiff has alleged sufficient facts to support his conspiracy claim against Block, Koberlein, Dundovich, and Slater, but fails to do so against Howard. "[D]rawing the line between a conclusory and non-conclusory conspiracy allegation isn't always a precise task."[76] "Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain other actions of the alleged conspirators taken to achieve that purpose will be deemed sufficient."[77]

Plaintiff sufficiently alleges Block, Koberlein, Dundovich, and Slater intentionally fabricated inculpatory evidence, suppressed exculpatory evidence, and suppressed official misconduct in order to further their joint purpose and motivation during the immediate 24 hours after the shooting: to wrongfully prosecute Plaintiff and Warren. Specifically, Plaintiff alleges Block and Koberlein worked in concert to pressure and coerce Brandon into affirming the fabricated information they fed him with the goal of falsely implicating Warren and an unknown assailant in a red shirt.

Likewise, Plaintiff sufficiently alleges that within 12 hours of the shooting, Block, Koberlein, and Dundovich met with each other and thereafter suppressed that Golubski

---

[75] *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)); *see also Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (affirming dismissal of conspiracy claim where "plaintiff failed to allege specific facts showing agreement and concerted action among defendants").

[76] *Zorn v. City of Marion*, 774 F. Supp. 3d 1279, 1330 (D. Kan. 2025).

[77] *Cash v. Wetzel*, 8 F. Supp. 3d 644, 661 (E.D. Pa. 2014) (citation modified).

baselessly injected names and descriptions of the alleged shooters into the investigation. For

example, after Block and Koberlein advised Dundovich to locate Plaintiff and an unnamed man,

Dundovich fabricated evidence of how he found Plaintiff to cover up the fact that the

information of Warren's whereabouts actually originated from Golubski. Additionally, Plaintiff

alleges that after Block and Slater met, Slater pressured and coerced Brandon into identifying

Plaintiff in a photo lineup and then produced a fabricated report that lied about that photo

identification. This all occurred within 24 hours of the shooting and after various meetings

among these Defendants and Golubski prior to the deprivation of Plaintiff's constitutional rights.

> The [C]ourt acknowledges that the line dividing plausible
> conspiracy allegations from implausible is not a bright one. But
> the Amended Complaint adequately alleges the conspiracy's
> members, the conspiracy's timeframe, the purpose and motivation
> of the conspiracy, and the overt acts taken to achieve its aim.
> Taken collectively, those allegations suffice. They raise a
> plausible inference of a conspiracy.[78]

While Plaintiff's conspiracy allegation is stronger against some Defendants than it is against

others, the Court finds the allegations are sufficient at this stage against Block, Koberlein,

Dundovich, and Slater.[79]

In contrast to Block, Koberlein, Dundovich, and Slater, Plaintiff does not allege a

plausible conspiracy extending to Howard. Plaintiff fails to allege specific facts that Howard

came to an agreement with any of the other Defendants. And while Plaintiff does allege Howard

signed reports containing fabricated evidence, there are no facts alleged that allow a reasonable

---

[78] *Meyer v. City of Marion*, 776 F. Supp. 3d 991, 1022 (D. Kan. 2025) (citing *Cash*, 8 F. Supp. 3d at 661).

[79] *See, e.g.*, *Bledsoe*, 53 F.4th at 609–10 (affirming denial of motion to dismiss where plaintiff alleged "specific goal of the conspiracy" and "identified specific actions" each individual defendant took to consummate conspiracy); *Montoya v. City & Cnty. of Denv.*, No. 21-1107, 2022 WL 1837828, at *8 (10th Cir. 2022) (affirming denial of motion to dismiss where allegations of conspiracy weren't "impressively detailed" and included some "boilerplate language" but still advanced sufficient allegations to infer an implicit agreement); *Erickson v. City of Lakewood*, 489 F. Supp. 3d 1192, 1204 (D. Colo. 2020) (declining to dismiss conspiracy claim where complaint alleged that defendants made a plan, assigned roles to co-conspirators, and carried out roles).

inference that Howard did so with knowledge of the fabrication or after a meeting of the minds to further a general conspiratorial objective.  Even if Howard's approval of these false reports amounts to an illegal act, "unlawful parallel activity doesn't necessarily suggest an agreement, the keystone element of a conspiracy theory."[80]  As such, Plaintiff fails to plausibly allege his conspiracy claim against Howard, thus Howard is entitled to qualified immunity on this claim.

Finally, Plaintiff has also demonstrated the second prong of the qualified immunity analysis on his conspiracy claim—that it was clearly established at the time of the 2009 shooting investigation.  As the Tenth Circuit has explained, "a § 1983 conspiracy claim for using fabricated or false evidence was clearly established well before 1999."[81]

---

[80] *Zorn*, 774 F. Supp. 3d at 1330–31.

[81] *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (citing *Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985)).

### 5.    Supervisory Liability Claim (Count V)

The supervisory liability claim in Count V is alleged against Defendants Howard and Golubski's Estate.  Howard moves to dismiss on the basis that Plaintiff failed to adequately allege his supervisory liability claim, entitling him to qualified immunity.  Although a supervisor may be held liable under § 1983 for the actions of his subordinates, a supervisor's liability is not based on *respondeat superior,* but on the supervisor's own actions or inactions.[82]  A plaintiff must show a violation of a clearly established constitutional right for each defendant in a § 1983 suit who claims qualified immunity;[83] § 1983 does not give a plaintiff a right of action against an individual government official under a theory of respondeat superior.[84]  Nevertheless, a supervisor can be liable for the injuries caused by the conduct of a subordinate "in situations where an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."[85]  The affirmative link between the constitutional violation and the supervisory defendant is typically shown through the supervisor's "adoption of any plan or policy . . . showing authorization or approval of such misconduct."[86]

Both Plaintiff and Howard cite case law immediately before and after the Supreme Court's decision in *Iqbal*, which the Tenth Circuit applied in the context of a § 1983 supervisory-liability claim in *Dodds v. Richardson*.[87]  And while the Tenth Circuit acknowledged that "*Iqbal*

---

[82] *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000) (citing *Gagan v. Norton*, 35 F.3d 1473, 1476 n.4 (10th Cir. 1994)).

[83] *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010).

[84] *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

[85] *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008)

[86] *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).

[87] 614 F.3d 1185, 1200 (10th Cir. 2010).

may very well have abrogated § 1983 supervisory liability as we previously understood it," it emphasized that *Iqbal* did not alter the Supreme Court's previous § 1983 causation and personal involvement analysis that the Court finds instructive here.[88]

In *Rizzo v. Goode*, the Supreme Court determined a mayor, police commissioner, and other city officials could not be held liable under § 1983 for constitutional violations committed by unnamed individual police officers because:

> As the facts developed, there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct.  Instead, the sole causal connection found by the District Court between petitioners and the individual respondents was that in the absence of a change in police disciplinary procedures, the incidents were likely to continue to occur, not with respect to them, but as to the members of the classes they represented.[89]

In *Dodds*, the Tenth Circuit explained that *Rizzo* confirms courts "properly impose § 1983 liability upon individual defendants who act with the requisite degree of culpability to promulgate, create, implement, or otherwise possess responsibility for the continued operation of policies that cause the deprivation of persons' federally protected rights."[90]

Here, Plaintiff argues Howard supervised Dundovich and reviewed and approved Dundovich's police reports that included fabricated inculpatory statements and excluded exculpatory statements.[91]  As already explained above, Plaintiff adequately pleads that Dundovich deprived him of his constitutional rights when he fabricated evidence and suppressed

---

[88] *Id.*

[89] *Rizzo*, 423 U.S. at 371.

[90] *Dodds*, 614 F.3d at 1201.

[91] For example, Dundovich's reports excluded the fact that Warren and Moore were inserted into the investigation by Golubski, rather than any other evidence or statements obtained by the investigating officers.

43

material exculpatory evidence.  But on the supervisory liability claim, the Court now asks whether an "affirmative link exists between the unconstitutional acts by [Dundovich] and [Howard's] "adoption of any plan or policy . . . express or otherwise showing [Howard's] authorization or approval of such misconduct."[92]

The Court finds Plaintiff sufficiently pleads his supervisory liability claim against Howard.  Howard reviewed and signed the false police reports that the prosecution and police utilized to accomplish the eventual wrongful conviction of Plaintiff and Warren.  Further, Howard knew he was reviewing police reports concerning an investigation commanded by Golubski, who was well-known for manufacturing charges against innocent individuals.  At this procedural stage, Plaintiff pleads enough to show an affirmative link between Dundovich's misconduct and Howard's authorization or approval of that misconduct, which thereafter deprived Plaintiff of his constitutional rights.

Finally, Plaintiff has also demonstrated the second prong of the qualified immunity analysis on his supervisory liability claim—that it was clearly established at the time of the 2009 shooting investigation.  The Tenth Circuit in *Dodds* explained that it, along with "the great weight of authority from other circuits[,] clearly established by 2007 that officials may be held individually liable for policies they promulgate, implement, or maintain that deprive persons of their federally protected rights."[93]  As such, Howard is not entitled to qualified immunity on this claim.

---

[92] *Rizzo*, 423 U.S. at 371.

[93] *Dodds*, 614 F.3d at 1207.

### B.   *Monell* Liability Claims Under § 1983

The Unified Government argues Plaintiff failed to adequately allege his *Monell* liability claim.  The Supreme Court has made clear that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."[94]  Instead, a local government may be liable under § 1983 only when a plaintiff establishes (1) an official policy or custom, (2) that caused their civil rights injury, and (3) deliberate indifference by the government entity.[95]  An "official policy or custom" may take one of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.[96]

### 1.   Official Policy or Custom

Plaintiff alleges his *Monell* claim based on: (1) informal custom; and (2) failure to adequately train or supervise employees.  The Unified Government argues Plaintiff's pleading is conclusory and fails under Rule 12(b)(6).[97]  Specifically, the Unified Government argues

---

[94] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[95] *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020).

[96] *Waller v. City & Cnty. of Denv.*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)).

[97] Defendant also argues Plaintiff's *Monell* claim necessarily fails because he fails to plead the underlying constitutional claims, but the Court disagrees as explained earlier.

Plaintiff "[relies] on generalized allegations of unconstitutional 'customs and practices' in felony investigations" and insufficiently relies on the isolated acts of Golubski.[98]  The Court disagrees.

First, Plaintiff adequately alleges a decades-old KCKPD informal practice of abusing power and leveraging violence, corruption, and retaliation to manufacture wrongful arrests and convictions against innocent individuals.  Specifically, Plaintiff alleges this informal custom manifested, in part, in Golubski's open display of corruption and his pattern of sexually preying on Black girls and women in Kansas City, Kansas.  Indeed, officers would openly joke about the children Golubski fathered across Kansas City because of his pattern of rape and sexual assault.

In response, the Unified Government argues that Golubski's isolated acts, even with supervisory authority, do not establish a policy or custom, and that Plaintiff fails to allege that Golubski possessed final policymaking authority over the relevant investigation.  This argument is unpersuasive.  Plaintiff's allegations plausibly show that the Unified Government had a pattern and practice of allowing Golubski to openly assault, coerce, threaten, and falsely incriminate individuals while investigating and collecting evidence.  For example, Plaintiff pleads the following about Golubski's widespread and informal custom of abusing power and using violence, corruption, and retaliation to manufacture cases against the innocent:

> 79.     Supervisors and detectives throughout the KCKPD also knew that Golubski would abuse his authority to clear warrants and make cases against his informants disappear in exchange for sexual favors and information.  Golubski regularly received assistance up and down the chain of command in order to provide those benefits.

> 80.     . . . Although Golubski's corruption was common knowledge at the KCKPD, he was never reprimanded or punished and was instead promoted, becoming a captain before his retirement—which is the position he held when he oversaw the investigation into the homicides of Charles and Mr. LeDoux.

---

[98] Doc. 32 at 13–14.

81. The KCKPD did not welcome reports or complaints about officers, and the KCKPD never investigated Golubski for any of the rampant misconduct that he regularly engaged in over a period of decades. . . . Multiple KCKPD officers have given sworn statements and provided testimony under oath describing Golubski's exploitation of vulnerable Black women and their families and the permissive or collusive supervision at the KCKPD that allowed him to get away with it.

82. As just one example of Golubski's exploitation and misconduct, Golubski framed Lamonte McIntyre for a double homicide in retaliation for Mr. McIntyre's mother rejecting his sexual advances and harassment. . . .[99]

At the 12(b)(6) stage, these allegations suffice.

Second, Plaintiff alleges the Unified Government failed to adequately train or supervise employees. To adequately allege a claim based on failure to train, Plaintiff must allege that the "failure results from deliberate indifference to the injuries that may be caused."[100] Plaintiff satisfies the deliberate indifference standard by showing that "the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm."[101] "[D]eliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action."[102]

The Court finds Plaintiff's allegations plausibly show that the Unified Government had a pattern and practice of allowing Golubski to openly assault, harass and coerce individuals while

---

[99] *See* Doc. 55 ¶¶ 79–82.

[100] *Waller*, 932 F.3d at 1283 (quoting *Bryson*, 627 F.3d at 788).

[101] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999)).

[102] *Barney*, 143 F.3d at 1307 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)).

investigating and collecting evidence.  These allegations, if true, are sufficient to establish that the Unified Government had actual or constructive notice of Golubski's conduct in investigating the shooting and that the Unified Government deliberately chose to disregard the substantial risk of the resulting constitutional violations.

Finally, the Unified Government argues Plaintiff fails to adequately allege ratification, that Golubski had final policymaking authority, or that there was a qualifying official policy. But Plaintiff does not advance these other theories of *Monell* liability in his First Amended Complaint.  Plaintiff has satisfied his burden of pleading the custom or policy element of his *Monell* claim by alleging facts to support an informal custom and failure to train.

### 2.    Causation

The Unified Government offers a cursory recitation of the causation standard before concluding Plaintiff fails to meet this standard.  The Court disagrees.  "To establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'  This requirement is satisfied if the plaintiff shows that the 'municipality was the "moving force" behind the injury alleged.'"[103]  Here, Plaintiff adequately alleges the Unified Government's policies and customs of utilizing coerced statements and fabricated evidence, and suppressing exculpatory evidence of the same, while affixing these acts

---

[103] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (quoting *Brown*, 520 U.S. at 404).

48

onto innocent individuals, directly deprived Plaintiff of his constitutional rights and resulted in his wrongful incarceration.

### 3. Deliberate Indifference

As discussed above alongside the failure to train allegation, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."[104]  The Court finds Plaintiff plausibly alleges that the Unified Government had a pattern and practice of allowing Golubski and other detectives to assault, harass, coerce, and frame innocent individuals, and deliberately chose to disregard the substantial risk of the constitutional violations that predictably flow from that custom.

For the reasons stated above, Plaintiff has adequately pled *Monell* municipal liability against the Unified Government, thus the Unified Government may be liable under § 1983.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss (Doc. 32) is **granted in part and denied in part**.  Plaintiff's conspiracy claim (Count IV) against Howard is **dismissed**.  Defendants' motion to dismiss is otherwise **denied**.

**IT IS SO ORDERED.**

Dated: May 4, 2026

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[104] *Brown*, 520 U.S. at 407.

49